DUTCHESS SPECIAL TERM, December, 1850. *Barculo,*
Justice.

BENSON and others *vs.* THE MAYOR, ALDERMEN AND COM-
MONALTY OF THE CITY OF NEW-YORK, PIERREPONT and
LE ROY.

The charter of 1708, called the Cornbury charter, gave to the mayor, alder-
men and commonalty of the city of New-York, the right and power to es-
tablish ferries between the city of New-York and Long Island, and to hold
them, with the tolls and revenues, forever. And the corporation having
acted upon that and other grants, by establishing and maintaining the *South
ferry* and the *Hamilton Avenue ferry,* the city of New-York and its inhabit-
ants have acquired vested rights and valuable interests in those ferries,
which can not be taken away by the legislature.

Those ferries having been established under the authority of the charters
granted to the city, and being run by lessees holding on short leases, under
the corporation, they are in judgment of law "set up, established, kept,
and maintained" by the corporation, within the true intent and meaning of
the charters.

The *Fulton ferry* having been in existence at the time of the several grants to
the city of New-York, became thereby vested in the corporation of the city,
as property; and is now so held, by an indefeasible title.

The act of May 14, 1845, to establish and regulate ferries between the city of
New-York and Long Island, does not by its terms, embrace the three exist-
ing ferries, or interfere with vested rights; so as to require the court to
determine its unconstitutionality. On the contrary it excepts those ferries,
and leaves the rights of the city of New-York, therein, undisturbed.

Whether the corporation of New-York has the right to establish future fer-
ries; and how far the act of May, 1845, will interfere therewith. *Quære.*

Ferry franchises may be held by a municipal corporation, without losing
their character of private property.

A grant of a ferry franchise, which has been accepted and acted upon, par-
takes of the nature of a contract, so far as to be protected by that clause
of the federal constitution, which inhibits the states from passing laws
"impairing the obligation of contracts."

Vested rights in property, acquired by virtue of a statute, can not be divested
nor destroyed by a repeal or modification of the statute.

Ferry franchises are partly of a public and partly of a private nature. Cer-
tain duties and burdens are imposed upon the grantees, who are compen-
sated therefor by the privilege of levying ferriage, and the security from
spoliation, arising from the irrevocable nature of the grant. The state may

legislate touching them, so far as they are *publici juris.* Thus, laws may be passed to punish neglect or misconduct in conducting the ferries, to secure the safety of passengers from danger, imposition, &c. But the state can not take away the ferries themselves, nor deprive the grantee of his legitimate rents and profits.

The franchise, however, may be *forfeited* by non-user or mis-user, judicially ascertained; and the government, in the exercise of the sovereign power of eminent domain, may resume the property for public use, on making a just compensation; but not otherwise.

IN EQUITY. This was an application by the plaintiffs for an injunction perpetually enjoining the corporation of New-York from granting any lease or leases of the Fulton, South and Hamilton Avenue ferries, between the cities of New-York and Brooklyn, or either of them, to the defendants Pierrepont and Le Roy, or to any other person or persons; and that restraining Pierrepont and Le Roy from accepting any such lease; and for a temporary injunction *pendente lite.* The facts are stated in the opinion of the court.

*Dan Marvin, Wm. Kent,* and *B. F. Butler,* for the plaintiffs.

*H. E. Davies* and *John Van Buren,* for the city of New-York.

*Mr. Dikeman* and *F. B. Cutting,* for the defendants Pierrepont and Le Roy.

BARCULO, J. By an act of the legislature of this state, passed May 14th, 1845, entitled "an act to establish and regulate ferries between the city of New-York and Long Island," the governor was authorized to appoint three commissioners, who should have power to grant licenses for establishing and keeping so many ferries, and at such places, as in their opinion the public convenience might require, between the city of New-York and Long Island; but not to grant a license for any ferry or ferries which "shall interfere with the rights, franchises or privileges of the mayor, aldermen and commonalty of the city of New-York, in and to any ferries already established, nor for a

longer period, at any one time, than ten years." The commissioners appointed under this law, did, on the 17th of October, 1848, grant to the plaintiffs a license to establish and keep four ferries across the waters of the East river, between the city of New-York and the city of Brooklyn, viz. the ferry commonly known by the name of the "Fulton ferry," and the ferry commonly known by the name of the "South ferry;" of which two ferries, the license was to continue ten years from the date thereof, and to commence at the expiration of a lease for seven years, held by the defendants, Le Roy and Pierrepont, from the corporation of the city of New-York, bearing date the 13th of May, 1844; also, the ferry commonly known by the name of the "Hamilton Avenue ferry," of which the license was to continue ten years from the date thereof, but not to commence before the termination of a lease, during the mutual pleasure of the parties, between the mayor, &c. of the city of New-York, and the defendants Le Roy and Pierrepont, bearing date the 6th day of November, 1846; and also, a new ferry from the foot of Wall-street, in the city of New-York, across the waters of the East river, to the foot of Montague-street in the city of Brooklyn, of which the license was to continue ten years, commencing on the day of the date thereof. On the 7th of November, 1848, the plaintiffs served upon the mayor of the city of New-York, a copy of such license, and gave the requisite notice, preparatory to obtaining the necessary wharfs, slips, landing-places, and other property, pursuant to the act aforesaid.

The city authorities, however, denying the validity of the act, and of the plaintiffs' license thereunder, instead of treating with them for the ferry property, commenced an action in this court, in May, 1849, to test the constitutionality of said law, in which they prayed that the present plaintiffs might be enjoined from proceeding under their said license, and that the same might be given up to be cancelled. This suit is still pending and undetermined.

On the 16th day of December, 1850, the board of aldermen of the city of New-York adopted a resolution that the lease to Jacob R. Le Roy and Henry E. Pierrepont, for the "Fulton,"

" South," and " Hamilton Avenue" ferries, be renewed for the term of ten years from the first day of May next, at an annual rent of $35,000; which resolution was concurred in by the board of assistant aldermen, and was about to be carried into effect, as is alledged by the complaint, at the commencement of this suit.

This is a condensed statement of the material facts, and the law, upon which the plaintiffs invoke the aid of the court; and pray, as their relief, that the corporation may be perpetually enjoined from granting any lease or leases of the said ferries, or either of them, to the said Le Roy and Pierrepont, or to any other person or persons; and that said Le Roy and Pierrepont be restrained from accepting any such lease.

The application now before the court seeks, on behalf of the plaintiffs, a *temporary* injunction, restraining the defendants as above mentioned, *pendente lite.* This application is opposed by the defendants, upon two grounds : 1st, that it is not a proper case for an injunction; 2d, that the title to the ferries in question is vested in the city of New-York; and that the act of the legislature, so far as it interferes with them, is unconstitutional and void.

The first objection will be disposed of in a few words. The granting or refusing a preliminary injunction, rests in the sound discretion of the court, to be exercised according to the circumstances of each case, with a view to prevent a party, during the pendency of the litigation, from making a vexatious alienation of the thing in controversy, or doing any act in violation of the rights of the other party respecting the subject of the action, and tending to render the final judgment ineffectual. The writ is frequently allowed to restrain the transfer of property, real or personal, until a disputed title can be determined. (*Story's Com. on Equity*, §§ 907, 8, 9. *Code*, § 219.)

In the present case, if the plaintiffs are entitled to the ferry franchises in dispute, they are entitled to an injunction to restrain the corporation from alienating them to others, who might not be bound or affected by the final judgment in this cause. For otherwise, at the termination of this suit, the plaintiffs

Benson v. The Mayor, &c. of New-York.

might discover that the subject matter of the litigation was held under a long lease from the corporation, by third persons, whose rights, although they might not be of any higher degree than those passed upon in this suit, would, nevertheless, require a new suit, and render another adjudication between new parties necessary, before they could be declared void, and the real owners recover full possession.

The two learned counsel on the part of the defendants, who argued that point with so much zeal and earnestness, were entirely mistaken, in supposing that the effect of the injunction would be to turn the defendants out of the possession of the ferries, and confer the rents and profits upon the plaintiffs. So far from this being true, the very object of the injunction, as well as its legitimate effect, would be to *keep* the defendants *in the possession*, and forbid the transfer thereof. Nor has the court, as yet, been able to discover the resemblance between this application and the unheard of case of awarding an injunction, in an action of ejectment, to turn out the defendant and give the plaintiff the use and enjoyment of the premises, pending the controversy; to which, as well as to many other legal phenomena, this case has been compared. The court has not seen any reason to change the opinion, intimated on the argument, that, if the plaintiffs show a title to the ferries, an injunction would be proper to prevent the corporation from disposing of them, until the final hearing.

The great question to be discussed, relates to the title. And as that is strictly a legal point, depending upon an undisputed state of facts, and as it has been argued at great length, and with great ability, the court will bestow upon it the same careful examination and deliberation which would be due to so grave a matter upon the ultimate decision of the cause.

The original title of the corporation of the city of New-York, to the ferries in dispute, rests upon the ancient charters or letters patent granted by the British crown, and upon the cotemporaneous colonial legislation. So much of these as may be necessary to present the case fully, will be briefly set forth. The earliest now extant is known as "Governor Dongan's

charter," and bears date the 22d of April, 1686. It recites, that, whereas, New-York is an ancient city, and the citizens a body politic and corporate, and have held and enjoyed divers privileges, franchises, &c. and have had given to them, by various names, lands and tenements, &c. "and, whereas, the citizens and inhabitants of the said city have erected, built and appropriated, at their own proper costs and charges, several public buildings, accommodations, and conveniences for the said city, *that is to say:* the city hall, or stat-house, with the ground thereunto belonging; two market-houses; the bridge into the dock; the wharves or docks, with their appurtenances; and the new burial place, without the gate of the city; and *have established and settled one ferry from the said city of New- York to Long Island, for the accommodation and conveniency of passengers, the said citizens and travelers.*" It proceeds to give, grant, ratify and confirm unto the said mayor, aldermen and commonalty of the said city, not only the before mentioned rights, privileges, &c. but also the aforesaid public buildings, accommodations, and conveniences in the said city, *that is to say,* the aforesaid city hall or stat-house, with the ground thereunto belonging, two market-houses, the bridge into the dock, the wharves or dock, the said new burial place, and the aforementioned ferry, with all the rights, profits and benefits arising therefrom. Next in order, is the Cornbury charter, bearing date the seventh year of the reign of Queen Anne, (1708,) which, after reciting that the mayor, aldermen and commonalty of the city of New-York, had presented a petition to Governor Cornbury, setting forth that they had a right and interest, under divers ancient charters and grants, "in a certain ferry from the said city of New-York, over the East river, to Nassau Island, (alias Long Island,) and from the said island to the said city again, and have possessed the same, and have received all the profits, benefits and advantages thereof, for the space of fifty years and upwards; and, perceiving the profits, advantages, and benefits usually issuing out of the same, to diminish, decrease, and fall short of what might be reasonably made of the same, for the want of the bounds and limits to be extended and en-

Benson *v.* The Mayor, &c. of New-York.

larged on the said island side, whereby to prevent divers persons transporting themselves and goods to and from the said Island of Nassau, (alias Long Island,) over the said river, without coming and landing at the usual and accustomed places, where the ferry boats are usually kept and appointed, to the great loss and damage of the said city of New-York," and had humbly prayed a grant and confirmation of the said ferry, called "the Old Ferry," and also of the vacant and unappropriated land, between high and low water mark, on the Long Island side, fronting the city of New-York, from the Wallabout to Red Hook, "with full power, leave, and license to set up, establish, maintain, and keep, one or more ferry or ferries, for the ease and accommodation of all passengers and travelers, for the transportation of themselves, goods, horses, and cattle, over the said river, within the bounds aforesaid,"—proceeds to grant, first, the Old Ferry, as follows: "*Know ye,* that of our especial grace, certain knowledge, and mere motion, we have given, granted, ratified and confirmed, and in and by these presents, for us, our heirs and successors, we do give, grant, ratify and confirm unto the said mayor, aldermen and commonalty of the city of New-York, and to their successors and assigns, all that, the said ferry, called the Old Ferry, on both sides of the East river, for the transportation of passengers, goods, horses, and cattle, over the said river, to and from the said city and island, as the same is now used, held, and enjoyed by the said mayor, aldermen and commonalty of the said city of New-York, or their under-tenant or under-tenants, with all and singular the usual and accustomed ferriage, fees, perquisites, rents, issues, profits, and other benefits and advantages whatsoever, to the said Old Ferry belonging, or therewith used, or thereout arising;" and then grants the vacant and unappropriated land from the east side of the Wallabout to the west side of Red Hook,— saving and reserving to the inhabitants between Wallabout and Red Hook, on the river side, " the right of transporting themselves and their goods only, in their own boats, from and to their respective dwellings and plantations, without paying ferriage." Then follows this important clause: " and we do further, of our

especial grace, certain knowledge, and mere motion, for us, our heirs and successors, give and grant unto the said mayor, aldermen and commonalty, and their successors, full and free leave and license to set up, establish, keep, and maintain one or more ferry or ferries, as they shall, from time to time, think fit and convenient, within the limits and bounds aforesaid, for the ease and accommodation of transporting passengers, goods, horses, and cattle, between the said city of New-York and the said island, (except as hereinbefore excepted,) under such reasonable rates and payments as have been usually paid and received for the same; or which at any time hereafter shall be by them established, by and with the consent and approbation of our governor and council of our said province, for the time being. And we do further, of our especial grace, certain knowledge, and mere motion, give and grant unto the said mayor, aldermen and commonalty of the city of New-York, and their successors, full and absolute power and authority to make, ordain, establish, constitute, and confirm all manner of by-laws, orders, rules, ordinances, and directions, for the more orderly keeping and regularly maintaining the aforesaid ferry that now is kept, or any ferry or ferries which shall, at any time or times hereafter be set up, established or kept within the bounds aforesaid, by virtue hereof; or of, for, touching or concerning the same, (so always as the same be not contrary to our laws of England and of our province of New-York,) and the same at all times hereafter to put in execution, or abrogate, revoke or change, as they in their good discretion shall think fit and most convenient for the due and orderly keeping, regulating and governing the said ferry or ferries hereinbefore mentioned."

The last charter, known as the "Montgomery charter," bears date the fifteenth day of January, in the fourth year of the reign of George II. (1730.) It recites, at length, the two former charters, and admits that the inhabitants of the city, as a corporate body, had anciently held, or claimed to hold, sundry rights, franchises, &c. as well by grant as by prescription; but that doubts had arisen as to the validity of the two former charters, and that the mayor, aldermen and commonalty had petitioned

Benson *v.* The Mayor, &c. of New-York.

for a confirmation of their rights and privileges, and that they might have the soil four hundred feet below low water mark, around a portion of the city; and a grant of such other powers, liberties, franchises, &c. as might be needful for the good rule and government of said city. It then proceeds, at great length, and with an extraordinary redundancy of language, and variety of expression, not only to re-grant and re-confirm all that had been theretofore granted, or intended to be granted, but also to grant many other things, not before expressly given. That portion which relates to ferries, may be chiefly found in sec. 37, which grants "the ferry and ferries on both sides of the East river, and all other ferries now and hereafter to be erected and established all around the Island of Manhattan; and the management and rule of, and all fees, ferriages, and perquisites, to the same, or any part thereof, belonging or to belong." And in sec. 15, which gives.and grants "unto the mayor, aldermen and commonalty of the said city of New-York, and their successors for ever, that the common council of the said city, for the time being, or the major part of them, (but no other person or persons whomsoever, without the consent, grant or license of the said common council of the said city, for the time being, or the major part of them,) from time to time, and at all times hereafter, shall and may have the sole, full and whole power and authority of settling, appointing, establishing, ordering, and directing, and shall and may settle, appoint, establish, order, and direct such and so many ferries round Manhattan's Island, alias New-York Island, for the carrying and transporting people, horses, cattle, goods, and chattels, from the said Island of Manhattan to Nassau Island, and from thence back to Manhattan's; and also, from the said Island of Manhattan's to any of the opposite shores all round the same island, in such and so many places as the said common council, or the major part of them shall think fit. Who have hereby, likewise full power to let, set, or otherwise dispose of, all or any of such ferries, to any person or persons whomsoever; and the rents, issues, profits, ferriages, fees, and other advantages arising and accruing from all and every such ferries, we do hereby fully and freely, for

us, our heirs and successors, give and grant unto the mayor, aldermen and commonalty of the city of New-York aforesaid, and to their successors for ever, to have, take, hold, and enjoy the same, to their own use, without being accountable to us, our heirs, or successors, for the same or any part thereof."

On the 14th October, 1732, the colonial legislature passed an act, entitled "An act for confirming unto the city of New-York, its rights and privileges." The second section enacts, in formal, legal phraseology, that all the letters patent, grants, charters and gifts, sealed under the great seal of the colony of New-York, theretofore made to the mayor, aldermen and commonalty of the city of New-York, shall be deemed *valid*. The third section declares, in like manner, that all and singular said letters patent, &c. are hereby *confirmed* and *ratified*. The fourth section provides that the mayor, aldermen and commonalty may *hold, use* and enjoy, all and every the rights, privileges, &c. granted by said charters.

It is quite apparent, from a perusal of these three charters, and of their threefold legislative ratification, that, if *multiplicity of words* can secure the rights intended to be granted, those rights are safe beyond a peradventure. But the question recurs, what are the ferry rights given to the city, under and by virtue of these charters? In answering this, it will be necessary, carefully to analyze the operative terms of the grants, and endeavor to fix upon them a construction which shall be consistent with the general scope of the instruments, and the object of the grantors. In pursuing this investigation, the subject seems, naturally, to divide itself into three parts, and will, therefore, be considered: 1. In regard to the title of the corporation to the Old or Fulton ferry. 2. The title to the South and Hamilton Avenue ferries. 3. The right and power of the corporation to establish future ferries.

I. In respect to the old ferry, but little need be said. It was in existence long before the first charter; and was, by it, conveyed in fee to the corporation as property, in the same clause and by the same terms that conveyed the city hall, market-houses, wharves and burial place. The second charter grants

and confirms the title, in a similar manner, accompanied by a gift of all the ferriages, fees and benefits, and in connection with a conveyance of land. There being no doubt that a ferry *in esse* may be the subject of an absolute grant in fee, which will vest in the grantee an indefeasible estate ; it follows, that the corporation are seised of the old or Fulton ferry, by a title which no mere gratuitous act of the legislature can divest.

II. The other two ferries (South, and Hamilton Avenue,) not having been in existence at the time of the grants, stand upon a different footing, which renders it necessary to inquire into the precise nature of the authority conferred by the charters upon the corporation, to create ferries *in futuro*. Did the corporation take a *private* or a public right ? Did they obtain a power to create and keep ferries, and receive the profits as a source of revenue and emolument, as well as for the public convenience ; or were they clothed, merely, with a branch of the sovereign prerogative, by which they were authorized only to license, superintend, and govern ferries for the public good, in their political capacity, and in the exercise of a political power, until such power should be transferred or resumed by the state or government ? These are the real issues upon which this case turns.

The counsel for the plaintiffs contend that grants of franchises to a municipal corporation, are to be strictly construed : that they are presumed to be of an exclusively public character ; that the charters, by a fair interpretation, convey only an authority to administer the ferry franchise as a political trust, and that it is held by a tenure similar to that of the power to license ferries, deposited with the courts of common pleas ; and is liable to be resumed, and has been resumed by the legislative act of 1845.

It may be well, here, to glance at a few of the settled legal principles which lie at the foundation of the subject. The right to establish and keep a ferry, is, in law, termed a franchise. In England, franchises are understood to be royal privileges, in the hands of a subject. In this country, they are deemed privileges conferred by government. They rank, as estates, among incorporeal hereditaments, and are founded on grant or prescription.

Benson v. The Mayor, &c. of New-York.

In the one case, the extent of the franchise is ascertained by the terms of the grant; and in the other, by usage. They impose upon the holders, certain liabilities and duties to the public—involving an expenditure of money, in establishing and keeping accommodation for travelers or passengers. They also confer certain privileges and powers, as an indemnity, among which is the right of demanding and recovering compensation for transporting persons or property, which right is recognized as property, and protected as property, by the laws of England and of this country. "The obligation," says a learned commentator, "between the government and the owner of such franchises, is mutual. He is obliged to provide and maintain facilities for accommodating the public, at all times, with prompt and convenient passage. The law, on the other hand, in consideration of this duty, provides him a recompense, by means of an exclusive toll, to be exacted from persons who use the road or ferry." (3 *Kent's Com.* 458.) Such franchises may be granted to an individual, to a private corporation, or to a municipal corporation. The same learned writer says : " Public corporations are such as are created by the government, for political purposes, as counties, cities, towns, and villages; they are invested with subordinate legislative powers, to be exercised for local purposes connected with the public good, and such powers are subject to the control of the legislature of the state. They may also be empowered to take and hold private property, for municipal uses ; and such property is invested with the security of other private rights. So corporate franchises, attached to public corporations, are legal estates, coupled with an interest, and are protected as private property." (2 *Kent's Com.* 275.) And, in the case of *Bailey* v. *The Mayor, &c. of New-York,* (3 *Hill,* 531,) Chief Justice Nelson had occasion to discuss the character in which the city constructed the "Croton water works." He concludes that the grant is a special private franchise, made as well for the private emolument and advantage of the city, as for the public good ; and he draws a distinction between those powers which are conferred upon the corporation exclusively for public purposes, and those which are given for purposes of private advan-

Benson *v.* The Mayor, &c. of New-York.

tage and emolument. " Suppose," says he, on page 540, " the legislature, instead of the franchises in question, had conferred on the defendants banking powers, or a charter for a railroad leading into the city, in the usual manner in which such powers are conferred upon private companies ; could it be doubted that they would-hold them in the same character and be subject to the same duties and liabilities? I can not doubt but they would. These powers, in the eye of the law, would be entirely distinct and separate from those appertaining to the defendants, as a municipal body." It is evident, therefore, that such franchises may be held by a municipal corporation, without losing their character of private property.

With these legal principles in view, let us consider the precise terms and language of the grants. The right in the charter of 1708, is conveyed by the words " give and grant," " full and free leave and license,·to *set up, establish, keep and maintain* one or more ferry or ferries." In regard to the operative words, " give and grant," it is only necessary to say, that they are the very words, *do et concesso,* which are most peculiarly appropriate to convey incorporeal hereditaments, according to all the authorities. (2 *Black. Com.* 317.) If, therefore, it had been the intention of the crown to convey the franchise to the city for its own sole and exclusive pecuniary benefit, this is exactly the language that would have been selected.

But the corporation is authorized to *set up, establish, keep and maintain* ferries. In what sense are these terms used? Can they be fairly construed as referring to the bare authority to supervise and control the ferries, or do they necessarily involve the duty of keeping and running them, and the privilege of receiving the recompense? Is it possible to satisfy this clause by determining that it gives only the political power of ordering and licensing ferries, similar to the power since lodged with the courts of common pleas? This latter question will be answered by a reference to the statute under which these courts act in this respect. It is thus expressed: " The court of common pleas in each of the counties of this state, shall *grant licenses · for keeping ferries* in their respective counties to as

many suitable persons as they may think proper." (1 *R. S.* 526.) It will be seen, that the legislature does not authorize the courts to *set up, establish, keep and maintain* ferries. They are to grant *licenses* to others, who are to *keep* the ferries. Moreover, the intrinsic force of the words themselves forbids the interpretation contended for by the plaintiffs' counsel. For, although it might, perhaps, be possible, if supported by strong expressions of intention in the context, to compel "set up and establish" to stand consistent with the idea of a mere public authority to pass ordinances in relation to the number, and location, and management of ferries; still, the words "keep and maintain," can not, by any ingenuity, be tortured into such a restricted sense. "To keep," is defined to mean, primarily, "to hold;" to retain in one's power or possession; not to lose or part with; to preserve, to retain."

The word "maintain," from *maintenir,* to hold in or by the hand, signifies "to hold, preserve or keep in any particular state or condition; not to lose or surrender; to continue." Now, if the corporation act in no other capacity than as representatives of the state, dispensing its franchises to others, on behalf of the sovereign power, in what respect can they be said to retain in their power or possession, and not to part with, that which they *must* part with, whenever it is called into exercise? In what sense can they be said to preserve, to continue, and not to lose or surrender that which they have no right to preserve, no power to continue, and which is without substance or value until it is surrendered to others?

But, independent of the philological argument, which seems to be as cogent as reasoning of that nature can be, there is an overwhelming flood of authority on this point, pouring in upon us, from the annual volumes of our session laws. Hardly a year has passed since the formation of our state government, without producing legislative grants of ferry franchises. In some instances, the authority is delegated to certain officers to grant ferry privileges: and in some, the grants are made directly from the state to the individuals or corporation, who are to have the beneficial ownership. From these, we may deduce a legis-

lative construction of the terms under consideration. It will be seen that a plain and unvarying distinction is preserved in the phraseology between those acts which confer the political power, and those which give a private right. One of the first examples of the former, was passed the 31st March, 1785. It authorizes the justices of the peace and the overseers of the poor, of the townships of Oyster Bay, in Queen's county, and of New-Rochelle, in the county of Westchester, " to lease for any term not less than four, nor more than seven years, the right and privilege of setting up, keeping, and maintaining a ferry from their respective townships." Here, it will be seen, that the public officers take only the authority to *lease*, and not the authority to have a ferry. The lessees who are to run the ferry, are to have the privilege of *setting up, keeping, and maintaining* the ferry. An instance of the latter may be found among the laws of 1800, by which Joseph Travis and Joshua Colwill are empowered " *to set up, keep, and maintain* a ferry across the Hudson's river, at Peekskill, for the term of twenty-one years. Here, the grantees obviously take the franchise as a private right, which can not be divested during the term, except for some good cause of forfeiture. Of a similar character, is the act of April 6, 1804, conferring upon Henry Van Garden the right " to set up, keep, and maintain" a ferry across the Hudson river, near Catskill; and the act of April 7, 1804, giving to Timothy Bunker the right " to set up, keep, and maintain" a ferry across the river, between Hudson and Athens. Similar enactments may be found in almost every volume of our session laws. At the very last session, no less than seven laws were passed, authorizing corporations or individuals to run ferries, and receive the emoluments arising therefrom. Among these, is one passed April 8, 1850, granting to Ward B. Howard, the right " to set up, keep, and maintain" a ferry, across the Hudson river from Breakneck to Cornwell; also, one passed April 9, 1850, authorizing Edward Hubbard and others, " to establish and maintain" a ferry from Cornwell to Coldspring; also, one passed April 10, 1850, incorporating " the Holland's Hook and Elizabethtown Point ferry company," for the purpose of " estab-

lishing and maintaining" a ferry, from Richmond county to Elizabethtown Point, New-Jersey. In all of these legislative grants, the words " set up, establish, keep, and maintain," or some of them, are used; and it is believed that the word " keep" or " maintain" is used, in every instance of the grant of a ferry, as a private right, and in no instance to confer the political power of ordering and licensing.

Moreover, the legislature themselves seem to have given the construction here claimed to the grant in question. The act of 2d April, 1801, provides, that the mayor, aldermen and commonalty of the city of New-York, "may establish and keep one or more ferries between the said city and the island of Nassau;" and "no person other than the said mayor, aldermen and commonalty, shall *erect* or *keep* a ferry between said city and Nassau island." We do not suppose that this clause increased the powers possessed by the corporation, for the simple reason, that they already possessed them, given in language of at least equal import by the charters nearly a century before. This act is regarded rather as a legislative exposition and confirmation of the ferry rights conveyed by the charters. But, if it were conceded that the charters conveyed no rights in this respect, this act would have secured to the corporation the very rights in issue; and every ferry established under it would have become the property of the city, beyond the reach of legislative resumption. This act authorizes the corporation to run ferries, in language that can not be mistaken nor misunderstood. For it not only gives the corporation this privilege in express terms, but it also positively *forbids* any one else to erect or keep a ferry: so that, unless the corporation run the ferries, no ferries could exist.

But let us look a little further at the legislative construction of the words in this charter. It is claimed, on the part of the plaintiffs, that the commissioners appointed under the act of 1845, are clothed with the same authority as that given to the corporation by their charters, and transferred from the latter to the former by the law. It is but reasonable, then, to suppose, that the same powers will be conferred, if not in the precise lan-

guage, at least in language of similar import.   But we find that
this is by no means the case.   The act merely provides, that
" three disinterested persons shall be appointed by the governor
of the state," &c. "who shall have power to grant licenses."
We do not find any thing of their power " *to set up, establish,
keep, and maintain*" ferries.   They are authorized only to
*grant licenses.*   Can it be possible, that the phraseology of the
act conveys the same thing as the essentially different language
of the charters ?

We will pursue the inquiry, and see what the licenses are
granted for.   They are to be granted to such person or persons
as the commissioners deem suitable to conduct the same, " for
establishing and keeping" so many ferries as the public conven‑
ience may require, between New-York and Long Island.   We
have now found the words of the charter " establish and keep,"
and we discover that they are applied, not to the commissioners
who dispense the franchise as the political power of the state,
but to the grantees, who are actually to carry on the business
of running the ferries, and enjoy the tolls thereof.   Why not
apply the same construction to the charters ?

But this point admits of another illustration.   The plaintiffs
claim title under a license, which, upon inspection, is ascertained
to be a license " to establish and keep" four ferries.   It, how‑
ever, appears by the charters, that the corporation were long
ago authorized " to set up, establish, keep, and maintain" as
many ferries as they pleased.   The grant to the corporation is,
at least, as broad and as comprehensive as the license of the
plaintiffs.   If, therefore, the corporation do not take the rights
in dispute, for want of suitable words in the grant, neither do
the plaintiffs take any thing.   If, on the other hand, the terms
of the license are sufficient to convey the franchise, then are
also the terms of the charter sufficient to have conveyed it to
the corporation, one hundred and forty-three years ago.

In addition to all this, there are other clauses in the charter
which manifest an intention to vest the franchise absolutely in
the city.   Thus, the same power is given to regulate and con‑
trol the ferries to be established, as is given relative to the old

ferry, then in existence : from which may fairly be inferred, a design to place them on the same footing, or that they should be held by the same tenure. Again, we find the grant accompanied by a grant of the land on the Long Island shore ; which was evidently made as auxiliary to, and for the purpose of securing in the corporation, the exclusive use of the ferries. If, therefore, we adopt the fair legal interpretation of the language of the grant,—if we follow the legislative construction which has been put upon similar grants for sixty years,—if we are guided by the collateral lights emanating from the other provisions of the instrument, we are led to the unavoidable conclusion, that the charter of 1708 gave to the mayor, aldermen and commonalty of the city of New-York, the right and power to establish the ferries in question, and hold them, with the tolls and revenues for ever.

It is unnecessary to refer to the charter of 1730, further than to remark that it fully confirms and ratifies all that was done, or intended to be done, by the two previous ones. Under this authority, the two ferries in question have been established. They are run by lessees, holding on short leases, under the corporation. In judgment of law, they are " set up, established, kept, and maintained" by the corporation, within the true intent and meaning of the charters.

We will now consider the propositions already incidentally adverted to, and now more distinctly stated, *that the city of New-York and its inhabitants, have acquired vested rights and valuable interests in these ferries which can not be taken away by the legislature.* This doctrine of the inviolability of such franchise interests, rests upon two grounds : 1. The constitutional protection thrown around contracts. 2. The sacredness of vested rights.

In regard to the first, the authorities are abundant to show, that a grant of a franchise of this description, which has been accepted and acted upon, partakes of the nature of a contract, so far as to be protected by that clause of the federal constitution, which inhibits the states from passing laws " impairing the obligation of contracts." The leading case on this subject, is

Benson v. The Mayor, &c. of New-York.

that of *Dartmouth College* v. *Woodward*, (4 *Wheat. Rep.* 444,) in which the supreme court of the United States decided, that the charter granted by the British crown to the trustees of Dartmouth College in the year 1769, was a contract within the constitutional prohibition; and, that a law of the state of New-Hampshire, altering the charter, was unconstitutional and void. Although that decision was made in reference to a private corporation, established for the purposes of education, the principles upon which it is based are equally applicable to all cases of franchises coupled with a pecuniary interest. In the opinion delivered by Justice Story, we find the following remarks : "A grant of franchise is not, in point of principle, distinguishable from a grant of any other property. If, therefore, this charter were a pure donation, when the grant was complete, and accepted by the grantees, it involved a contract that the grantees should hold, and the grantors should not re-assume the grant, as much as if it had been founded on the most valuable consideration." "In respect to franchises, whether corporate or not, which include a pernancy of profits, such as a right of fishery, or to hold a ferry, a market, or a fair, or to erect a turnpike, bank or bridge, there is no pretense to say, that grants of them are not within the constitution."

It may be proper here to notice an argument urged upon the court, with great earnestness and ability. It was said, that this doctrine, although sound in regard to private corporations, has no application to public municipal corporations. We admit the correctness of this argument, so far as it requires a *strict construction* of grants under which such bodies claim rights of a private nature ; and we freely concede that, in cases of ambiguous or doubtful phraseology, the presumption should be against such claim, and in favor of a public trust. But this consideration can not affect the case before us—for the reason, that here there is no doubt nor ambiguity ; the grant is made in the plainest and most appropriate and most expressive language known to the law, the use of which, for such purposes, has been sanctioned by ages. In the case last cited, the court say : "it may also be admitted, that corporations for mere public govern-

ments, such as towns, cities, and counties, may, in many respects, be subject to legislative control. But it will hardly be contended, that in respect to such corporations, the legislative power is so transcendant, that it may, at its will, take away the private property of the corporation, or change the uses of its private funds acquired under the public faith." If the franchise, by its nature, carries with it private property, no matter *by whom* it is held, it must be deemed within the principles of the above decision, and secured by the constitution.

The case of *Charles River Bridge* v. *Warren Bridge*, (11 *Peters*, 420,) has also been pressed upon the court as an illustration of legislative control over chartered rights. But that case is clearly distinguishable from this. There, the legislature of Massachusetts, having, in 1785, incorporated a company to build a bridge over Charles river, from Charlestown to Boston, with authority to receive tolls, in 1828 incorporated another company for the erection of the Warren bridge over the same river, commencing in Charlestown, near where the Charles river bridge commenced, and terminating in Boston, about eight hundred feet from the termination of the Charles river bridge. The Warren bridge, having become a free bridge, diverted the travel from the Charles river bridge, so as to destroy the value of the franchise granted in 1785. The supreme court of the United States held that the act incorporating the Warren bridge company, was constitutional, and did not impair the contract made with the other company ; because the first charter did not expressly give the *exclusive right* to the Charles River bridge company, to erect bridges over that river ; and that no contract not to grant other similar franchises, could be implied against the government. It will be seen that that case differs from this, in these essential particulars : *First.* There, the legislature did not attempt to take away the identical franchise given by the charter of 1785, the injury done to it being incidental to the subsequent grant. On the contrary, it was conceded throughout that case, that the legislature could not directly repeal the first charter. *Second.* There was no provision in the act incorporating the Charles river bridge company, giving them

any exclusive privileges, except that of having their bridge; nor were there any stipulations restraining the state from granting the subsequent charter. Chief Justice Taney, in his opinion, says, " to entitle themselves to relief, it is necessary to show that the legislature contracted not to do the act, of which they complain; and that they impaired, or in other words, violated that contract by the erection of the Warren bridge. The inquiry then is, does the charter contain such a contract on the part of the state? Is there any such stipulation to be found in that instrument? It must be admitted, on all hands, that there is none." It may not be improper here to remark that, that case was decided by a bare majority of the court—Justices McLean, Thompson and Story dissenting; the latter, in a masterly opinion, which was fully concurred in by Judge Thompson, saying that, so far as it permitted the state of Massachusetts to do indirectly, what it could not do directly, it violated a familiar legal principle; and that, to say the least of it, it stands upon the extreme verge of the law; and, perhaps, reaches a little beyond justice and good faith.

Since the foregoing was written, the opinion of the supreme court of the United States, delivered by Justice Woodbury, in the case of *The Town of East Hartford* v. *The Hartford Bridge Co.* has been received. On examination, it does not appear to affect the present case, in any essential degree. So far as they can be gathered from the opinion, the circumstances of that case are simply these : about the year 1680, the colonial legislature of Connecticut granted to Hartford certain rights in a ferry across the Connecticut river. The grant itself was not produced, and its terms could only be indistinctly ascertained by usage. In 1783, one-half of the privilege was transferred, by the legislature, to East Hartford, " during the pleasure of the assembly." In 1808, a company was incorporated to build a bridge across the river near the ferry; and in 1818, the legislature passed a law *discontinuing* the ferry. In 1836, the legislature passed a law, repealing that part of the act of 1818 which discontinued the ferry. In 1841 the repealing act of 1836 was repealed; and in 1842, the act of 1841 was repealed,

thus leaving the law as it stood prior to 1818. The state court decided the laws of 1836 and 1842, to be unconstitutional and void within the provisions of the state constitution, and upheld the validity of the law of 1818. The supreme court of the United States assumed the decision below to be correct, so far as related to the laws of 1836 and 1842; and also decided that the law of 1818 was constitutional and valid, upon the grounds, *first*, that there was *no contract*, " as the parties to the grant did not, by their character, stand in the attitude towards each other, of making a contract by it, such as is contemplated by the constitution ;" and *second*, that the grant having been made " during the pleasure of the assembly," the discontinuance of the ferry was a legal expression of the legislative pleasure, within the condition. It will be seen that the facts of that case vary from this, in three important particulars. *First*, the express terms of the original grant were unknown; and of course, it was impossible to ascertain the precise powers given. According, therefore, to a principle hereinbefore recognized and admitted, the presumption should be against the grant of a private and exclusive right. *Second*, the franchise was claimed by a *town*, which is, at most, but a *quasi* corporation, created by a general state law, and differs essentially from a chartered city. *Third*, the grant was made to East Hartford *during the pleasure* of the legislature, and not *in fee*.

The other ground, upon which the title of the city in the ferries can be maintained, has been stated to be *the sacredness of vested rights*. Admitting, therefore, that there is no contract within the constitutional meaning, and assuming that the charter is of no higher nature than a legislative act, which can be repealed at will ; still, the corporation, having gone on and established the ferries under such charter, have become vested of a property right, which can not be destroyed by the law-making power. It is the settled law of this state, that vested rights in property, acquired by virtue of a statute, can not be divested nor destroyed by a repeal or modification of the statute. ( *The People* v. *The Supervisors of Westchester,* 4 *Barb. S. C. Rep.* 64.) The inhabitants of the city of New-York have a vested

Benson *v.* The Mayor, &c. of New-York.

right in the city hall, markets, water works, ferries, and other public property, which can not be taken from them, any more than their individual dwellings, or store-houses. Their rights, in this respect, rest not merely upon the constitution, but upon the great principles of Eternal Justice, which lie at the foundation of all free governments.

To prevent misconstruction, it may be proper to remark, that these conclusions do not necessarily exclude the legislature from all control over the ferries. Franchises of this description are partly of a public, and partly of a private nature. So far as the accommodation of passengers is concerned, they are *publici juris ;* so far as they require capital and produce revenues, they are *privati juris.* Certain duties and burdens are imposed upon the grántees, who are compensated therefor by the privilege of levying ferriage, and the security from spoliation, arising from the irrevocable nature of the grant. The state may legislate touching them, so far as they are *publici juris.* Thus, laws may be passed to punish neglect or misconduct in conducting the ferries, to secure the safety of passengers from danger, and imposition, &c. But the state can not take away the ferries themselves, nor deprive the city of their legitimate rents and profits. The franchise, however, may be *forfeited* by non-user or mis-user, judicially ascertained ; and the government, in the exercise of the sovereign power of eminent domain, may resume the property for public use, on making a just compensation ; but not otherwise.

It will be perceived, that the foregoing reasoning renders it unnecessary to inquire further as to the power of establishing future ferries. The only question properly before the court, relates to the existing ferries ; and we design carefully to avoid volunteering an opinion, the effect of which might be, as is too often the case, to mislead, and embarrass subsequent litigation.

The only remaining inquiry is, whether the act of 1845 interferes with vested rights, so far as to require the court to determine its unconstitutionality. It excepts the rights of the city of New-York to the established ferries. The plaintiffs' counsel contend, that the only *established* ferry, at all events, was the

Fulton ferry. This seems to be an unnatural construction. A better interpretation would be given, by assuming, that the legislature meant to include within the exception, all the ferries to which the corporation had title. This would except from its operation all the *existing ferries*, and make the statutes, in this respect, consistent with the vested rights.

This, also, is in conformity to the rule of expounding statutes, which requires, when a law admits of two meanings, one of which conflicts with the constitution, and the other not, that the latter is to be adopted. (*Quackenbush* v. *Danks,* 1 *Denio,* 128.) If, however, the act must be construed to include the existing ferries, it must also be pronounced unconstitutional and void.

The conclusions to which the foregoing reasoning leads us, are: 1. That the "old" or Fulton ferry, having been in existence at the time of the *grants*, became thereby vested in the corporation of the city, as property; and is so held, at this time, by an indefeasible title. 2. That the corporation, having acted upon the grants, by establishing and maintaining the other two ferries, known as the "South ferry," and "Hamilton Avenue ferry," have acquired therein vested rights, which can not be resumed by gratuitous legislation. 3. That the act of May 14th, 1845, does not, by its terms, embrace, but excepts the three existing ferries; and leaves them undisturbed, in the corporation. 4. That the questions of the right to establish future ferries, and how far the act of 1845 may interfere therewith, are not now before the court; and, therefore, not passed upon. 5. The plaintiffs not having established any title to the relief sought, the motion for an injunction must be *denied.*