AIKIN *et al. v.* THE WESTERN RAILROAD CORPORATION.

Under the Dongan Charter and the act of the Legislature (*ch.* 185 *of* 1826, § 48), the city of Albany has complete and exclusive control of all ferries within its limits.

The act of 1826, declaring that the Dongan Charter shall be so construed as to vest in the city of Albany the sole and exclusive right of establishing, licensing and regulating ferries, though nugatory as a judicial exposition of the charter, is operative as a grant of any power which might remain in the Legislature over the ferries mentioned in it.

*It seems,* that the act of 1826 is a grant not merely of legislative power but of proprietary right, *per* SELDEN, J.

The grant by the Legislature (*ch.* 111, *of* 1840) to the Western Railroad Corporation, of power to connect the terminus of its road on the east side of the Hudson, with a depot on the west bank, though it may, by implication, give the right to establish a ferry, does not constitute such ferry a part of the railroad, so that persons merely crossing the river may be regarded as passengers carried under the general railroad franchise.

Such grant being conditioned upon the consent of the corporation of Albany, having the control of ferries, and its consent being given by words waiving any charge for the privilege of carrying across the river persons or freight transported or to be transported upon the railroad or in the service of its proprietor, the right of ferriage is restricted to that of freight and passengers upon the road and its own property and servants.

The maintaining by the railroad corporation of a ferry, upon which it regularly and constantly transports gratuitously persons not passengers nor in its service, is an invasion of the right of the proprietor of a ferry franchise, for which it is responsible in damages, equally as where such unauthorized ferriage is accompanied by the collection of toll.

APPEAL from the judgment of the Supreme Court, at general term in the third district, upon a case submitted without action under the 372d section of the Code. The facts agreed upon by the parties are these: By chapter 262 of 1836, the Albany and West Stockbridge Railroad Company was authorized to make the western termination of its road at a point opposite the city of Albany, in the town of Greenbush. By chapter 111 of 1840, the company was authorized to construct one or more depots in the city of Albany, and to connect the same with its railroad by a single or double track, with the consent and approbation of the corporation of the city; but it was declared that the act should not be so construed as to authorize the company to construct a bridge across the Hudson river or in any manner to obstruct its navigation.

By an agreement between the corporation of Albany of the first part, the Albany and West Stockbridge Railroad Company of the second part, and the defendant of the third part, dated April 23d, 1840, the corporation of Albany gave its consent and approbation for the construction by the defendant—who by the same agreement became the lessee of the Albany and West Stockbridge Railroad—of one or more depots within the city of Albany, and to connect the same with its railroad by a single or double track, upon the terms and conditions prescribed in the act of April 13th (*ch*. 111), of 1840. The agreement also contains this provision: "The party of the first part further agrees that no charge shall be made to the party of third part for the right and privilege, at their own expense, to carry across the Hudson river, at Albany, the passengers and freight transported upon such railroad, or the officers, agents and servants of said party of the third part, or their engines, cars or other property." The defendant's railroad terminates on the eastern shore of the Hudson river, in the town of Greenbush, opposite to the original four wards of the city of Albany, and is connected with the city by means of ferry boats running from said termination across the river to the foot of Maiden Lane, within the limits of the original four wards of Albany and the bounds of the city as established by

the Charter of Governor Dongan. The defendant is in the habit of carrying across the river on its ferry boats other persons, teams and carriages than such as are specified in its agreement with the city, free of any charge therefor, which would necessarily cross the river by means of the plaintiffs' ferries, but for such carriage by the defendant; but such persons, teams and carriages are neither solicited nor excluded by the defendant who maintains its ferry for railroad purposes exclusively and without charging or collecting ferriage of any body.

The ferry boats used by the defendant navigate under coasting license, as provided by the laws of Congress relating to the coasting trade, being registered and licensed by the collector of the port of Albany.

The title of the plaintiffs to their ferry is stated in the following opinion. Their ferry is nearly half a mile south of the defendant's railroad ferry, and is at the same place where the only ferry was in use at the time of Governor Dongan's Charter in July, 1686. They claimed that the carriage by the defendant, of persons, passengers, teams and carriages, other than such as are mentioned and specified in the agreement of April 23d, 1840, before mentioned, is a violation of their rights, and asked that the defendant might be adjudged to account for the loss and damage sustained by the plaintiffs and be restrained from further violating their rights. The Supreme Court gave judgment for the defendant, and the plaintiffs appealed to this court.

*Jacob I. Werner*, for the appellants.

*John H. Reynolds*, for the respondent.

SELDEN, J.  By the agreement between the plaintiffs and the corporation of the city of Albany, dated Oct. 1, 1852, the latter demise to the former, for the period of twelve years, from the date of said agreement, the "sole and exclusive" right of ferrying across the Hudson, opposite the original four wards

of the city; excepting, however, any right theretofore granted, or which might thereafter be granted to any railroad company, whose road might terminate on the east side of the river, opposite the said four wards; such rights to be confined to the passengers and freight upon, and the agents and servants of such roads. If, then, the city of Albany possessed the power to convey the exclusive right described in this agreement, that right is now clearly vested in the plaintiffs.

The power is claimed: 1. Under the Charter of the city, granted by Gov. Dongan in 1686. The language of this Charter is as follows: After a recital of an existing ferry across the Hudson, from Albany to Greenbush, it proceeds to "give and grant full power, license and authority to said mayor, aldermen and commonalty, and their successors forever, to establish, appoint, order and direct the establishing, making, laying out, ordering, amending and repairing of ALL streets and ferries in and throughout the said city, or leading to the same, necessary, needful and convenient for the inhabitants of the said city and the parts adjacent, and for travelers there."

It is said, that the power conferred by this clause is not exclusive, and does not operate to prevent—even if it would, if exclusive in its terms, prevent—the exercise of a coördinate power by the Legislature. This, however, is a question which it is not important to settle. The plaintiffs rely not merely upon this provision in their charter, but also upon the act of the Legislature, passed in 1826, by which it was enacted and declared, that the charter should "be so construed, as to vest in the said mayor, aldermen and commonalty, the sole and exclusive right of establishing, licensing and regulating all ferries on each side of the Hudson river," between Albany and Greenbush.

I entirely concur in the position taken by the appellants' counsel, that the Legislature cannot exercise any judicial power; that it has no authority to construe laws and charters; the power to do this being confided not to the Legislature, but to the judicial branch of the government. But the Legislature may make new grants of power to existing corporations. If

full and complete authority over the ferries in question, was not given by the Dongan Charter to the city of Albany, then all the power not so given was reserved to and remained in the Government, and was transferred from the Colonial Governors, or the Crown, to the Legislature of the State. The act in question, therefore, although nugatory as a judicial exposition of the charter, may, nevertheless, operate, as in my view it was intended to operate, as a grant to the city of Albany of any power which might remain in the Legislature over the ferries mentioned in it. I deem it clear, therefore, that either under the original charter, or under that and the act of 1826 together, the corporation of the city had the full, complete and exclusive control of all the ferries within its limits, so far as the Legislature could confer that power.

But it is said, that although a ferry, actually established by virtue of a grant, is private property, and the grant itself a contract, yet the mere authority to establish ferries is not a proprietary right, but a political power vested in the Legislature for public purposes alone, and cannot therefore be sold, transferred or made the subject of a contract: that although a portion of this power may be delegated to a municipal corporation, yet like every other power of a political nature, conferred upon such bodies, it may be controlled, resumed or modified at will by the Legislature. Hence, it is argued, that although the act of 1826 was intended to vest in the city of Albany, full and exclusive control over the ferries within its limits, yet it was not in the power of the Legislature to render this authority supreme and paramount to its own; and consequently, that any subsequent act of the Legislature conferring ferry rights is valid, unless it conflicts with rights previously granted by the city of Albany, by virtue of its delegated powers.

This argument assumes that neither the Dongan Charter nor the act of 1826 were intended to vest in the city of Albany any proprietary rights in the ferries within its limits; but merely to confer a certain legislative control, to be exercised by the corporation, as the agents or representatives of the

sovereign power.   Whether this is a sound exposition of the rights and powers of the city derived from these sources, may well be doubted.   Some portion of the language of the act of 1826, seems to me susceptible of a broader interpretation.   The words "establishing and regulating," may with propriety, perhaps, be considered as purely legislative, or as granting power merely and not property; but "license" is a word frequently if not generally used in connection with rights of property.   It has, I apprehend, been uniformly supposed, both by the Legislature and the corporate authorities of the city, that the latter had a vested right to the revenues to be derived from the ferries in question.

But it is unnecessary to pass upon this in the present case. If the corporation possessed, not a franchise, but simply a delegated power, to be exercised as the agent or representative of the Legislature, still the plaintiffs must have obtained by the lease, executed to them in 1852, the "sole and exclusive right" of ferrying between Albany and Greenbush, except so far as that right may have been impaired or limited by some legislative act.

The only act by which it is claimed that the exclusive right supposed to be attached to the ferry in question has been in any manner limited or curtailed, is that passed on the 13th of April, 1840, amending the act incorporating the Albany and West Stockbridge Railroad Company, to the rights of which the defendants have succeeded.   The third section of that act is in these words: "The said company shall have power to construct one or more depots, at some suitable place or places in the city of Albany, and to connect the same with such (their) railroad, by a single or double track, with suitable turnouts and branches, *with the consent and approbation of said city.*   But no part of this section shall be so construed as to authorize the said company to construct a bridge across the Hudson river, or in any manner to obstruct the navigation of the same."

As this act preceded the plaintiffs' lease from the city, whatever rights it conferred upon the defendants, or those under

whom they claim, were prior and therefore paramount to those of the plaintiffs. The case, therefore, depends in a great measure upon the construction to be given to this act, and to what has been done under it. Its language is peculiar, and indicates, I think, a design to evade or supersede what were supposed to be the ferry rights of the city. It was intended, no doubt, to enable the railroad company to do precisely what it has done, viz.: To establish a ferry in connection with their road.

It is contended by the defendants' counsel, that the act authorizes the company to connect their depot in Albany, with their road upon the east bank of the river, and hence, that the passage across the river is to be deemed a part of their railroad; and that persons who merely wish to cross the ferry are to be regarded as passengers upon the road, the company having the same right to transport them there as upon any other part of the road.

This idea, it will be found, I think, difficult to maintain. The provision in the act, inhibiting the company from constructing a bridge, left them no way of making the connection which it authorized but by means of a ferry, and hence the power to establish a ferry may fairly be inferred. But when established under such a provision, it does not become a railroad. Its nature is not changed. A ferry is not a railroad, nor a railroad a ferry. Both franchises, *i. e.*, the right to construct a railroad and to erect a ferry, may be granted to one corporation, where the grant conflicts with no other rights. But if the right to establish a ferry is conferred upon a railroad company, it does not cease to be a ferry, and become part and parcel of the railroad itself; nor can any language which the Legislature can use in conferring the right, make it such. The two things are in their nature distinct, and cannot be merged. If a ferry may constitute part of a railroad, then a Legislature, which has made one exclusive grant of a ferry, and thus parted with the right to establish any other, may nevertheless authorize the construction of a railroad across the river, and under this authority, according to the doctrine contended for, a ferry

boat may be run from side to side of the river, without infringing upon the ferry previously granted. The fallacy of this is too plain to need further comment. The rights of the defendants are precisely the same as if the power to establish a ferry had been granted in specific terms.

If the ferry rights, derived by the railroad company under the act of 1840, had been absolute and unconditional, it would then have become necessary to determine, whether the city of Albany is possessed of a franchise, or only of a delegated power of legislation. But, as I construe the act, the ferry rights conveyed are made dependent upon the consent and approbation of the city. Those rights result solely from the clause authorizing the company to connect their depot upon one side of the river with their railroad upon the other, which is in these words: "and to connect the same with such railroad, by a single or double track, with suitable turnouts and branches, with the consent and approbation of said city."

The consent here required, clearly extends to the connection to be made. The words, "to connect," are the dominant words in the sentence, to which all the rest are subordinate; and there can be no rule of interpretation which would authorize us to confine the requisite consent to what was to be done upon the land within the bounds of the city.

The defendants, then, have no rights of ferriage under the act in question, except such as have received the consent and approbation of the city of Albany. It becomes necessary, therefore, to examine and put a construction upon the contract entered into between the railroad company and the city, on the 23d of April, 1840, as it contains the only consent which is shown on the part of the city corporation.

By this contract, the city expressly agrees to give its consent and approbation to the construction of the depots within the city, and to their connection with the railroad, "upon the terms and conditions prescribed in the act." This might possibly confer upon the railroad company an unlimited right of ferriage, were it not qualified by another clause, which is in these words: "And said party of the first part (*i. e.*, the city),

further agrees, that no charge shall be made to the said parties of the third part, for the right and privilege, at their own costs and expenses, to carry across the Hudson river at Albany, the passengers and freight transported, or to be transported upon said railroad, or the officers and servants of said party of the third part, or their engines, cars or other property."

It is plainly to be implied, I think, from this clause, that the right of transportation across the river by the railroad company, was intended to be limited to the persons and property named therein. There are many reasons which point to this construction. If any ferry was created or authorized beyond this, it must necessarily be a free ferry. Toll cannot be levied without express authority from the Legislature; and the act in question confers no such power. It is not probable that the city intended to consent to the erection of a free ferry for all persons, in direct hostility to the proprietary rights which it claimed under the Dongan Charter. Again, if an unrestricted free ferry was in the contemplation of the parties, there could have been no reason for the specifications contained in the clause quoted. It would in that event have been general, agreeing to make no charge for the transportation of persons or freight of any description. The agreement not to charge, would naturally have been, and no doubt was understood to be, co-extensive with the rights of transportation intended to be conferred. My conclusion, therefore is, that the defendants' rights of ferrying across the river, derived from the act of 1840 and the subsequent consent of the city, were strictly limited to the transportation of their own servants and agents, and passengers and freight upon their road.

It follows, that the defendants, in suffering their boats to be used for the purpose of transportation across the Hudson by persons other than those mentioned, are guilty of an infringement of the ferry rights of the plaintiffs; unless to constitute such an infringement it is necessary that such transportation should be for hire. That the transportation of such outside persons, and their freight, by the railroad company, is in all cases gratuitous, without charge or profit of any kind, was not

made a point by the defendants' counsel upon the argument; but as the Supreme Court appears to have made this, in part at least, the foundation of its judgment, it may be well briefly to consider it.

It would seem to be true, as suggested by the Supreme Court, that the right to take toll is essential to every ferry, considered as a franchise; and it may be that any private person might establish a free ferry across a navigable river, where no previous ferry existed, without subjecting himself to a *quo warranto*, or other prosecution on behalf of the government. The penalty imposed by our act regulating ferries, for the unauthorized transportation of persons or goods across any river or lake, is confined to cases where such transportation is "for profit or hire." (1 *R. S.*, 526, § 8.) Until, by the creation of a franchise, there exists some private right to be invaded, the establishment of a free ferry, being a public benefit, might not be obnoxious to any punishment. But the question here is, whether after the establishment of a ferry by one person, under a grant from the government, vesting in him the exclusive right, another person can set up a free ferry by the side of it, without subjecting himself to any liability to the owner of the franchise. The remedy afforded by the law in all such cases proceeds upon the ground that the competing ferry is a private nuisance; and it is obvious that a free ferry would be productive of far more serious injury to the proprietor of the franchise, than one which charged toll.

If where no ferry has been previously granted, one may establish a free ferry with impunity, it is not because he has any legitimate right to do so, but simply for the reason that as no person is injured by his unauthorized act there is no one to complain. But the case is very different where vested rights are invaded. The owner of every ferry franchise is subjected to heavy responsibilities; being bound at all times to keep in readiness the necessary men, boats and other appliances required for the accommodation of the public; and a just reciprocity requires that he should be protected against the wanton destruction of his rights.

There is, as from the nature of the case might be expected, very little to be found in the way of authority upon this question. In most if not all the reported cases, where actions have been brought for the infringement of ferry rights, it has been alleged and proved, on the part of the plaintiff, that the transportation by the defendant was for hire. I have seen no case in which a recovery has been sought against one for transporting gratuitously. But the question has arisen in regard to a bridge, between which and a ferry, I can discover, in this respect, no difference. In the case of *The Charles River Bridge* v. *The Warren Bridge* (11 *Pet.*, 420), the plaintiffs made it a part of the gravamen of their bill, that the Warren Bridge was shortly to become free; and this did in fact occur before the argument of the cause in the Supreme Court. The question as to the effect of a free bridge upon the plaintiffs' rights was not directly passed upon, but it is easy to collect, from the remarks of both court and counsel, that the circumstance that the bridge was free was regarded on all hands as strengthening the plaintiffs' case. They failed in their suit, not because the Warren Bridge was free, but because their charter gave them no exclusive rights; and the court held that as against the public such rights could not be implied.

Mr. Webster, who argued for the plaintiffs, stated a case, where certain persons in Boston being about to erect a free bridge, which would interfere with the West Boston Toll Bridge, purchased the latter bridge, upon the assumption that their free bridge would be an infringement. (11 *Pet.*, 516.)

Judge McLean, also, in giving his opinion at page 568, stated, that in extending the National Road through Ohio, "a *free* bridge was thrown across a stream by the side of a toll bridge, which had some ten or fifteen years of its charter to run." It was contended that the owner of the toll bridge was not entitled to compensation; and the public authorities in the first instance so decided; but afterwards reversed this decision and awarded an indemnity.

These cases were not cited to prove that a free bridge would be as objectionable as a toll bridge, for that was not doubted, but

as bearing upon the extent of the plaintiffs' rights under their charter. They are, however, as available for the former purpose as the latter, and although they have not the weight of judicial decisions, they nevertheless serve to show how this question has been regarded by high public functionaries, and by persons acting, no doubt advisedly, in reference to important interests. That the circumstance that the Warren bridge was free, was considered as an aggravation of the injury, is obvious, from a remark of Judge TANEY, at page 549. In speaking of the plaintiffs' bridge, he says: "But its income is destroyed by the Warren bridge, which *being free* draws off the passengers and property which would have gone over it, and renders their franchise of no value. *This is the gist of the complaint.*"

When we consider the nature of The Charles River Bridge case, and the manner in which it was contested, the fact that no suggestion was made, either by court or counsel, that the circumstance that the Warren bridge was free afforded any ground of defence, makes the case one of decisive weight upon the question. There can be no doubt that the law on this subject is in accordance with the plain demands of justice, and that it affords a remedy against one, who, without profit to himself, invades his neighbor's franchise, no less than against one whose aggression is stimulated by the hope of reward.

It may still be said, that the transportation by the defendants of which the plaintiffs complain, is the mere involuntary incident of their legitimate business; that they have established no ferry but such as the law authorizes, and that they are not bound to incur extra trouble and expense, to prevent persons other than those they have a right to transport, from coming uninvited upon their boats. This defence, however, is not available. Every person is bound to exercise his own rights with due regard to the rights of others. If a person in carrying on any lawful business, as for instance smelting lead upon his own premises, creates a nuisance to his neighbor, he must either discontinue his business, or be at the expense, no matter how great, necessary to prevent the nuisance. Instances of this kind are numerous, and it is unnecessary to specify them.

·The present case may be illustrated, by comparing it with· that of the *Auburn and Cato Plankroad Company* v. *Douglass* (5 *Seld.*, 444). In that case it was held that the plaintiffs were not entitled to relief, because they had no right whatever beyond the limits of their road. Their charter having given them in terms no exclusive privileges, nor any rights as against adjoining proprietors, it was held that no such rights could be taken by implication. Their franchise was limited to obtaining the right of way for their road, laying down their plank, and erecting toll-gates thereon; and with this, the acts of the defendant did not interfere. Here the case is very different. The plaintiffs' ferry rights, except as they are modified by those specifically granted to the defendants, are exclusive of all others; and are co-extensive with that part of the river which is opposite the four wards of the city. The defendants carry on all their· ferry operations entirely within the territorial limits of the plaintiffs' franchise; their specific rights are in a manner carved out of the more general rights of the plaintiffs, and every instance of the ferrying across of persons other·than those whom the defendants have a right to transport, is a direct aggression upon the rights expressly conferred upon the plaintiffs. It is doing what.the plaintiffs are in terms authorized to do, and what they have a right to preclude any other persons from doing. The maxim *sic utere tuo*, &c., is frequently misapplied, but this is a case to which it has a direct application. A man may conduct his own business in his own way, whatever damage may result to 'his neighbor, provided no legal right of the latter is invaded. But he must so manage his affairs, at whatever cost, as not directly to infringe any right or privilege conferred by law upon another, or he is responsible for the consequences.

It is said to be impossible for the defendants to discriminate, as they take no toll from their passengers, between those they have and those they have not a right to transport. I apprehend, however, that there would be no great practical difficulty, if the defendants are desirous of doing so, in devising, in con-

cert with the plaintiffs, some mode by which the legitimate rights of the latter can be to a reasonable degree protected.

The judgment of the Supreme Court should be reversed, and a judgment should be rendered for the plaintiffs, pursuant to the prayer of their complaint, the details of which should be settled by one of the judges of this court upon notice to the parties.

. JOHNSON, Ch. J., DENIO, ALLEN, GRAY and GROVER, Js., concurred.

S. B. STRONG, J. (Dissenting.) There can be no doubt, but that when a ferry is actually initiated, and in operation under competent authority, the franchise, although public in its operation, is private property, and as such it cannot, when its exercise is free from abuse, be annulled or taken from the owner or lessee without compensation. That was decided in the well considered case of *Benson* v. *The Mayor, &c., of New York* (10 *Barb.*, 223). But the learned judge, who decided that case, said, that the question of the right to establish new ferries (by the Legislature, or under a subsequent legislative act) was not then before the court, and was not therefore passed upon. The power to establish, license and regulate future ferries is wholly political, and designed as a public trust. It has none of the essential attributes of private property. It can neither be sold nor transferred. It cannot be taken from the donee by an execution; nor is it liable to taxation. It cannot in itself be made the subject of a contract. In other words, it may create property but is not property.

Now, it has long been settled, and very properly, that political powers, conferred upon a municipal corporation for public purposes, no matter how exclusive the grants may be, are subject to subsequent legislative control. It is a frequent practice with our Legislature, to alter the charters of our cities and villages, as to political powers. Some of these are modified, some abrogated and new ones are introduced. Such changes are sometimes made upon the application of the corporate

authorities, and frequently without their assent.   The several changes in the police system in the city of New York, which materially altered and in fact abrogated some of its chartered powers, were without the consent, and notoriously against the will of its corporation; but they were held by this court to be valid.   It is equally well settled, that our Legislature cannot control or restrict its successors in the exercise of its political powers, by anything short of what may be deemed a contract; and, as I have already attempted to show, a devolution of political power upon a municipal corporation, is not a contract.   It is well that the rule should be as I have indicated. Such corporate powers, and particularly those which relate to the creation of monopolies, are sometimes exercised greatly to the detriment of the people; but where, as in many cases, the abuse is not of a character to call for a forfeiture by the judgment of a court of law, the evil might be irremediable but for the interposition of the Legislature.

I conceive, then, that the power of the Legislature to create new ferries over our navigable waters, notwithstanding the delegation of a similar power to a municipal corporation in exclusive terms, is indisputable.   If, then, the act of the 13th of April, 1840, extended the defendants' railroad, and thereby in effect created a ferry across the river, it is free from the constitutional prohibition against taking away private property without compensation.   The second section of that act provides, that "the (defendants) company shall have power to construct one or more depots, at some suitable place or places in the city of Albany, and to connect the same with such" (their) "railroad by a single or double track, with suitable turnouts and branches, with the consent and approbation of the corporation of said city."   But it provided that no part of that section should be so construed as to authorize the said company to construct a bridge across the Hudson river, or in any manner to obstruct the navigation of the same.   The effect of this enactment was to extend the road to such depot as the company might construct in Albany, the track in that city to be laid with the consent of its corporation.   That it was

the design of the Legislature so to extend it, is apparent from the restrictions, that the company should not bridge the river or obstruct its navigation. If it was not designed to authorize the company to cross the river, as a part of the route of their road, those restrictions would have been nugatory. I take it to be very clear, that where a river intervenes between the termini of a railroad, the main grant includes the right to cross the river, either by a bridge or by boats. That is a necessary incident. It is important that the company should have the right of passage, even when there are ferries; as the proprietors of the ferries might not feel inclined so to arrange their crossing as to accommodate the passengers on the railroad. The cars might arrive and depart at a late hour of the night, and the passengers might be subject to great delays and exposure if they were dependent upon a ferry proprietor. The consent of the corporation of Albany was probably deemed necessary, or at all events proper, to enable the company to construct in that city single or double tracks, with suitable turnouts and branches, in order to enable the company to reach the river from their new depot. There is nothing requiring the consent of the corporation to enable the company to cross the river. The implied grant as to that is unconditional, except as to the prohibitions against constructing a bridge and obstructing the navigation. The corporation of Albany, on the 23d of April, 1840, gave its consent to the construction of the depots, and the single or double tracks within the city, conformably to the act. In the agreement giving the consent, the corporation stipulated that no charge should be made (by the city corporation) to the railroad company, for the right and privilege, at their own costs and expenses, to carry across the Hudson river, at Albany, the passengers and freight transported, or to be transported, upon the railroad, or the officers and servants of the company, or their engines, cars or other property. That provision was no doubt inserted in the agreement to prevent any claim by the city corporation for compensation, under its power to regulate ferries. It contained no restriction of the right of the company to use the river as a part of its route. No

condition or qualification was annexed to the consent, if indeed any such had been sanctioned by the statute authorizing the extension of the route; which is at least very doubtful. There is indeed nothing in the agreement to limit such right. The company would have the same right to carry passengers and baggage across the river, as on any part of their route on the land. If they should choose to transport passengers, or baggage, or freight gratuitously on any part of their road, they would not have rendered themselves responsible in damages to a public turnpike in its immediate vicinity, because the profits of the turnpike company would thereby be diminished. If the managers of the railroad company should so act without reference to its interest, and with a disposition to injure the turnpike company, another question might arise; but such disposition has not been found or indeed intimated in this case. Passengers who have not previously passed, or do not intend to pass over other parts of the road, cannot be distinguished from the mere passers over the river without more difficulty, trouble and expense than the company is willing to encounter; and that probably causes the difficulty which has given rise to this controversy. Of course the company can gain nothing but additional trouble, by carrying other persons than their passengers, or other things than their freight, gratuitously; and probably if the lessees of the ferry would be at the necessary expense, they would be willing to exclude all but their own passengers and freight, from crossing the river free of expense.

I have thus far considered the case upon the supposition that the defendants claimed a ferry *eo nomine*. That, however, is not precisely this case. They claim the right to carry passengers and freight across the river, solely as a part of their railroad route. In fact, what they claim and do is without one of the descriptive characteristics of a ferry. They make no charge and receive no compensation for carrying either passengers or baggage across the river. A ferry is defined to be a liberty by prescription or the king's grant to have a boat for passage upon a river, for carriages, horses or men for reasonable toll (*Jacob's Law Dic.*, Title "*Ferry*"; *Burrill's Law Dic.*

*same title*).    All the definitions of the word, by law writers, are to the same effect.    The practice, of which alone the plaintiffs complain, is not that of ferry proprietors.    This presents a case where the grant of a public privilege by the Legislature for one purpose, incidentally diminishes the profits of a franchise (for there is a franchise in such ferries as existed at the time of the passage of the act extending the defendants' railroad), established for another purpose.    It is well settled that the injuries to the proprietors of such preëxisting franchise, resulting from subsequent legislative grants, are *damnum absque injuria.*

The grant of ferry privileges to the plaintiffs, in a lease made by the common council of Albany subsequent to the acquisition of the defendants' right, could not of course affect or impair such rights.    The judgment should be affirmed.

COMSTOCK, J., was also for affirmance.

Judgment reversed, and judgment for plaintiffs.