January Term,
1862.

SHEPARD
v.
MILWAUKEE
GAS LIGHT CO.

SHEPARD VS. THE MILWAUKEE GAS LIGHT COMPANY.

The *Milwaukee Gas Light Company* have a right to require that a person desiring to be supplied with gas shall sign a written application, stating the number of burners &c., but where the application they require him to sign is so connected with an agreement to abide by certain illegal rules and regulations adopted by them, that he cannot sign the former without being bound by the latter, he is not obliged to sign the application; and the company, by presenting the application in that shape for signature, waived their right to insist that he should have made the application in any other shape.

Where the rules of a gas company did not require payment for gas in advance but that the bills should be paid monthly, on the first day of each month, and that security should be given when required, and the company refused to furnish an applicant with gas upon the sole ground that he would not sign an agreement to abide by certain illegal rules and regulations, it was not necessary that the applicant should have repeated the demand monthly in order to entitle him to damages for a non-supply of gas during the time it was wrongfully withheld from him. If the company afterwards changed their purpose, they should have notified the applicant of it.

In an action against a *Gas Light Company* for wrongfully refusing to furnish the plaintiff's store with gas, the plaintiff gave evidence to show the nature and extent of his business, and that it was inconvenient and difficult to transact it without gas, and that the want of gas, he alone being deprived of it, made his store less attractive to customers and tended to diminish his business. *Held*, that the evidence was admissible.

The court, in such a case, did not err in instructing the jury that the plaintiff, if entitled to recover, should have such damages as would compensate him for the pecuniary loss, and also for the inconvenience and annoyance experienced by him in his mercantile business, arising out of the defendant's refusal to furnish gas to him.

APPEAL from the Circuit Court for *Milwaukee* County. This was an action for wrongfully refusing to furnish gas to light the plaintiff's store, upon a proper demand and offer to pay for it. The case was once before in this court, and the substance of the complaint and answer is stated in 11 Wis., 234. A previous action between the same parties (commenced before a justice of the peace), had also been in this court on appeal from the county court of Milwaukee, and this court held that the *Gas Light Company* might reasonably require its customers to sign written applications stating the number of burners required, &c., but that it could not require them to sign an agreement to abide by the "rules and regulations" which had been adopted by the Com-

*pany*, as some of them were unreasonable and such as the *Company* had no right to require its customers to consent to, as a condition of being supplied with gas. 6 Wis., 539.

On the trial of the present case, the proof was that the plaintiff, *Sydney Shepard*, lived in Buffalo, and his brother, Clarence Shepard, had the principal charge of his hardware store in Milwaukee; that on the 7th of February, 1857, McKenzie, a clerk of the plaintiff, by direction of Clarence Shepard, tendered to Mr. Clark, the secretary and superintendent of the *Gas Light Company*, at their office, $5, and requested him to put on the gas in the plaintiff's store, telling him that the gas fixtures, &c., were ready to receive it; that the secretary handed McKenzie a copy of the "Rules and Regulations," of the *Company*, and told him Mr. Shepard could have the gas when he would sign said "Rules and Regulations," and not till then. As to the damage sustained by the plaintiff for want of gas, proof was introduced to show the nature and extent of the plaintiff's business; that it was inconvenient and difficult to read the labels on the goods in the evening by the light of lamps and candles, the shelves reaching to the ceiling, sixteen feet from the floor; that they frequently sold goods in the evening to country merchants; that customers frequently found fault with their lights; that lighting their store by oil and candles made it difficult to sell goods, at wholesale or retail, in the evening; that the plaintiff went out of business Sept. 15, 1858, and the store up to that time was never lighted with gas. The following question was put by the plaintiff to one of his witnesses, who was a hardware merchant: " Which was preferable in the plaintiff's store as it was in 1856 and 1857, gas or oil to light it with?" The question was objected to by the defendant, but allowed, and exception taken. Answer, " gas. In the shelf hardware business there is an immense variety of goods—a great many sizes, and by having gas you are enabled to see the marks better than by any other light; and then it sets the articles off better; and to customers, the most pleasant place is the best place to buy goods. I noticed the plaintiff's establishment before the gas was let on. It appeared from the street to be a pretty dingy establishment. I think many

January Term,
1862.

SHEPARD
v.
MILWAUKEE
GAS LIGHT CO.

customers would be likely to pass by his store, lighted as it then was. I mean strangers or transient people. I should think it would be very inconvenient in getting out goods at night. Business could not be done as rapidly in the store at evening with oil and candle light as with gas." To another witness the question was put, " What is the mode in which inconvenience is caused by doing business with candles instead of gas?" Objection overruled, and exception taken. Answer, " The objection is, it would take twenty candles to get the same light you would get from one good burner. Snuffing candles would be an objection; candles would be greasy; then to keep store with candles you would have to keep a man to snuff them." To another witness the question was put, " What would be the effect on his business as a merchant in the plaintiff's locality, should he dispense with gas, he alone being deprived of it?" Answer, " It would injure his business." Question, 'How?' Objections to both questions overruled and exceptions taken. Answer, "I think it would lessen the attraction of the store, and be more inconvenient to do business; it is considered of some account to merchants to have an attractive store; it would be more inviting to customers to enter, and attractive to remain and do their business." Another witness testified that he was a hardware merchant; that there is a necessity for a bright light in the evening, in laying out goods; that bills of goods are made up both in the day time and evening, and that marking could not be done as speedily at evening by candle light as by gas light. Another witness testified that he was foreman in the plaintiff's tin shop (which was in the fourth story of the store), in 1857 and 1858; that the shop was not lighted with gas, though the fixtures were prepared for it; and the effect of not having gas was, that a great deal of the time they could not do the work; that they had work enough, but had often to stop, because they could not get along with the light, and on that account had to lose jobs."

The " Rules and Regulations" of the *Company* were also read in evidence by the plaintiff. The first rule was as follows: " All applications for the supply of gas must be made in writing at the office of the *Company*, the applicant

signing the "regulations," and stating the probable number of burners he may require." The third was : " The *Compa-* *ny* may, whenever they shall deem it expedient, require se- curity for the payment of gas expected to be consumed, or the deposit of a sum in advance to secure themselves against loss;" the eleventh was : " The quantity of. gas consumed will in all cases be ascertained, &c., and the bills rendered, monthly." That portion of the "Rules" which the court decided to be unreasonable, may be found in 6 Wis., *supra.* When the plaintiff rested, the defendant moved for a nonsuit, for the reason that the plaintiff had not made an application for gas in writing, stating the number of burners, &c., before the suit was commenced, and because the plaintiff was not entitled on the proof to recover. The motion was overruled, and the defendant excepted.

On the part of the defendant, Mr. Clark testified : " McKenzie came to the office once, and tendered me gold and asked for gas. I told him I would not let him have it until *Mr. Shepard* subscribed our rules ; I know that I told Mr. Shepard (Clarence) that I would vary some of our usual requirements rather than have trouble. I told him if he would sign the 'Rules,' I would put on the gas as soon as I could. He said he had looked over the 'Rules,' and would not subscribe them. I told him I could not give him gas until he signed them. When the company asked the consumers of gas to sign the 'Rules and Regulations,' they handed them a book at the top of each page of which was printed the following form : ' We, whose names are hereunto subscribed, do agree to take gas from the *Milwaukee Gas Light Compa-* *ny*, upon the terms and conditions stipulated in their printed rules and regulations,' underneath which were columns headed, ' name of applicant,' ' location,' ' no. of burners,' &c., and signing the book (under the heading 'name of applicant') with blanks filled up, was what the company meant by ' signing the rules,' and this had been explained to Mr. Shepard and to McKenzie before he tendered the money and made the demand. Clarence Shepard, after he refused to sign the rules, said if it were not for his boys he had rather go without the gas than to have it. I think the bills of .gas

in the plaintiff's store would run from $7 to $15 per month; there was nothing said by me to dispense with an application in writing that I remember; I know I virtually waived an application in writing when I offered to turn on the gas if he would sign the 'Rules.' I told him if he would sign the book or 'Rules,' he could have gas; I consented to the waiving of no rules of the *Company*, except to give him gas with his meter in the cellar. I think Mr. McKenzie did not make but two demands, one for the other suit, and one for this; Mr. Shepard's remark, that he would be willing to dispense with gas if it were not for his boys, was before the first suit was commenced."—Mr. Irons testified that he was assistant secretary of the *Gas Company* when McKenzie made the application for gas; that the custom of the *Company* always was to collect their gas bills monthly, which Shepard knew, and when the *Company* required a deposit of money as security, they required about $2 for each burner per month. "The *Company* was ready and willing to furnish gas to Mr. Shepard, without his signing the 'Rules,' as soon as the judgment in the first suit was paid, and the president told me then to furnish him with gas and waive the signing the 'Rules.' This was the 6th of September, 1858. I would have given the gas to the plaintiff, on my own responsibility, at any time after the first suit was decided in the county court, without his signing the 'Rules.' We did not inform the plaintiff we were willing to furnish the gas; the judgment of the county court was rendered June 15, 1857."

The court, at the request of the plaintiff, charged the jury, "1. If the jury find that the plaintiff, through an authorized agent, demanded the gas as stated in the complaint, and it was refused for the reason that he would not subscribe to the "Rules and Regulations" of the *Company* in evidence, and on no other ground, then the plaintiff is entitled to recover. 2. The plaintiff, if entitled to a verdict, should have such damages as will compensate him for the pecuniary loss, and also for the inconvenience and annoyance experienced by him in his mercantile business, arising out of the defendant's refusal to furnish gas to him." The court also instructed the jury "3. That if the *Company* refused to sup-

ply the plaintiff with gas, because he would not sign its 'Rules and Regulations,' it thereby waived an application for the gas in writing. 4. That if the jury believed the testimony, the plaintiff was entitled to recover damages of the defendant for its not furnishing gas for the whole period of time from the 7th day of February, 1857, up to the time he sold out his business, being about the 15th of September, 1858."

The defendant asked the court to instruct the jury, "1. That if they found that the plaintiff made no application in writing to the defendant for gas, but did make a verbal demand for gas on the 7th of February, 1857, and was then informed by the secretary of the defendant that he could have the gas by signing its application book, and by signing the 'Rules,' and not otherwise, and that both parties understood by signing the 'Rules,' signing said application book, and that the plaintiff refused to sign said 'Rules' or said application book, and that said 'Rules' are the same as those given in evidence on the trial, then they must find for the defendant. 2. If the court should refuse the first instruction thus asked, that then they instruct the jury, that if they find from the evidence that all bills due to the defendant for gas from its customers came due, during the years 1857 and 1858, on the first day of each month, and that the plaintiff, on and after the 7th of February, 1857, knew this, then in case they find a verdict for the plaintiff, they should assess the damages for not furnishing gas from February 7th, 1857, only for one month thereafter. 3. If the court should refuse the instruction first asked that then it should instruct the jury, that if they found from the evidence that the plaintiff, on the 7th of February, 1857, demanded gas of the defendant, and tendered five dollars as pay or security for gas for one month, and that he did not renew such tender or demand thereafter, and that said *Company* required all bills due for gas to be paid monthly, then the plaintiff is entitled to recover, if at all, only the damages sustained by him for one month from the time of such demand or tender. 4. If the court should refuse the 1st, 2d and 3d instructions so asked, that it then instruct the jury, that in case they find from the evi-

January Term,
1862.

SHEPARD
v.
MILWAUKEE
GAS LIGHT Co.

dence that in the years 1857 and 1858, all bills due the *Company* for gas from its customers, became due on the first day of each month, or monthly, and that this was well known by the plaintiff, and that from and after the 15th of June, 1857, the defendant was willing to furnish, and would have furnished, gas to the plaintiff, on his application, without his signing said 'Rules,' that then they must find damages for such refusal, only from the 7th day of February to the 15th of June of that year." The court refused each of these instructions.

Verdict for the plaintiff for $1500 damages. Motion for a new trial, because the verdict was excessive, and not warranted by the evidence or the law, and for error in the instructions given and in the refusal to give the instructions asked by the defendant. Motion overruled, and judgment on the verdict.

*Jason Downer*, for appellant:

The first instruction given by the court, allows the plaintiff punitive damages. If it had stopped with the words, " pecuniary loss," it would have been otherwise, but when it added " compensation for the inconvenience and annoyance of the plaintiff," it became clearly an instruction for vindictive damages. Sedg. on Dam., 35–39, 207, 454 and note. This was not a case for damages of that kind. The action was based upon a demand made the day after the judgment of the justice of the peace, in the previous action between the same parties, in favor of the *Company*, and sustaining the validity of their " Rules." Until the decision of that case in this court, 6 Wis., 539, both parties doubtless believed they were contending for the right, and the decision of this court in that case was made upon the ground that the action was based upon a contract. 2. The court erred in allowing the plaintiff to ask the witnesses the questions that were objected to on the trial; the true rule for damages was the pecuniary loss the plaintiff had sustained; he could not recover the *real or supposed profits* on the sales which he lost, or imagined he lost, because he had not gas in his store. This is too uncertain and remote to be taken into account. *Thompson vs. Shattuck*, 2 Met., 615; *Freeman vs. Clute*, 3 Barb.,

(S. C.), 424 ; Sedg. on Dam., 69–76. The court erred in re-  fusing the instructions asked by the defendant. The evi- dence shows that when the plaintiff made the tender and de- mand, he intended to demand and did demand the gas for *one month* only, and that at any time after June 15th, 1857, the *Company* would have given him gas if he had asked for it, without his *signing the rules.* 3. The damages are exces- sive.

*Smith & Salomon,* for the respondent.

*By the Court,* PAINE, J. It has been already decided by this court, that the *Gas Company* could not require the plain- tiff to sign an agreement to abide by the rules and regula- tions which had been adopted at the time the plaintiff's ap- plication for gas was made.

It was at the same time held, that the *Company* might rea- sonably require its customers to sign written applications stating the number of burners &c. On the last trial it was made to appear, that the written agreement which the plain- tiff was requested to sign, which contained a promise to abide by the rules and regulations, contained also the appli- cation for gas, stating the number of burners.

It is contended that as the company might require the plaintiff to make this application, and as he refused to sign the agreement which contained it, therefore he was himself in fault, in refusing to comply with a reasonable regulation, and his action could not be sustained. This conclusion would undoubtedly be correct, if the request to sign the ap- plication had been presented in such a form that the plain- tiff could have complied with it without at the same time signing an agreement which he was not bound to sign. But the agreement which he was required to sign as a condition precedent to having gas, consisted not only of the mere ap- plication, which was unobjectionable, but also of an agreement to take it upon the terms and conditions mentioned in the rules and regulations. This he was not bound to do. And therefore, as the only application which he was ever asked to sign, was so connected with an objectionable agreement that he could not sign one without being bound by both, of

January Term, 1862.

SHEPARD v. MILWAUKEE GAS LIGHT Co.

May 15.

course he was not obliged to sign it; and the company having presented it in that shape, must be held, by resting upon that, to have waived every other.

And it seems to us very evident that this point is entirely an afterthought, devised by the ingenuity of the counsel, and that it was not at all in the minds of the parties at the time the application was made. The company did not insist on the plaintiff's signing, merely to have a written application stating the number of burners. Nor did the plaintiff refuse because he was unwilling to sign such an application. But the company insisted in order to compel the plaintiff to agree to the rules and regulations, and the plaintiff refused in order to avoid that. And it would be very strange if the company could escape the consequences of its wrongful requirement, by merely connecting with the objectionable provisions, something unobjectionable, but so connected with the other that a signature to one bound the party by both.

But it is said that the court erred in the rule of damages. It told the jury that "the plaintiff, if entitled to a verdict, should have such damages as will compensate him for the pecuniary loss, *and also for the inconvenience and annoyance experienced by him in his mercantile business, arising out of the defendant's refusal to furnish gas to the plaintiff.*"

It is claimed that this instruction gave the plaintiff punitive or vindictive damages. But we think this is clearly not so. The "inconvenience and annoyance" occasioned directly by the wrongful act or refusal of the defendant, are always legitimate items in estimating the damages in actions of this kind. Vindictive damages are those which are given over and above all this, as a punishment for the other party. In actions for a nuisance, the damage usually consists almost entirely in inconvenience and annoyance. So also in many other actions of tort. In *Ives vs. Humphrey*, 1 E. D. Smith, 201, the court says: "Even if the plaintiff be confined strictly to compensation for the injury sustained by him, the jury are to determine the extent of the injury and the equivalent damages, in view of all the circumstances of *injury, insult, invasion of the privacy and interference with*

*the comfort of the plaintiff and his family.*"  And again : " For an involuntary trespass, or a trespass committed under an honest mistake, the damages should be confined to compensation for the injury sustained by the plaintiff, and in estimating the amount of such damages, all of the particulars wherein the plaintiff is aggrieved may be considered, whether of pecuniary loss, or pain or insult, or inconvenience."

January Term, 1862.

SHEPARD
v.
MILWAUKEE
GAS LIGHT CO.

So in an action for refusing to let a lessee into possession, the plaintiff gave evidence of injury to his wife's business as a milliner, without having averred it specially; but the court held it admissible under the general allegation of damage, as going to show that " the plaintiff had sustained inconvenience."  *Ward vs. Smith,* 11 Price, 19.  But it seems unnecessary to pursue this point, as it is really very plain that an instruction that the jury might consider the inconvenience and annoyance occasioned to the plaintiff by the wrong of the defendant, is not equivalent to an instruction that they might allow vindictive damages. .

But the appellant further objects to the admission of evidence to show that it would injure the plaintiff's business to be deprived of gas when other stores were lighted with it. It is said that the object of this was to show that the want of gas would tend to prevent customers from coming to the store, and consequently that the plaintiff lost the profits that he otherwise might have made.  And the appellant then relies on a class of authorities in which, both in actions of tort and for breaches of contract, it has often been held that anticipated profits could not be recovered as damages. Upon this subject the authorities are full of confusion and uncertainty, and it is very generally conceded that no definite or satisfactory rule can be extracted from them.  Sedgwick on Dam., p. 112 ; *City of Cincinnati vs. Evans,* 5 Ohio St., 603. But I think it can by no means be said to be established, that the profits of a business or of a contract may never be considered in estimating the damages, where one party has been deprived of those profits by the wrong or default of another.  On the contrary, I think the opposite conclusion is sustained, and that the tendency of the recent cases is to al-

low such profits to be recovered as damages, where their amount can be shown with reasonable certainty.

The question often arises in cases of breach of contract, and there are many authorities which hold that the profits that might have accrued to the injured party on the contract itself, which was broken, may be recovered as damages. *Railroad Company vs. Howard*, 13 How. (U. S.), 344; *Masterton vs. The Mayor &c., of Brooklyn*, 7 Hill, 61; *Fox vs. Harding*, 7 Cush., 522. These cases confine the profits to be recovered, to such as might have been made on the contract, the breach of which is complained of.

Yet it is very evident that even such profits cannot be arrived at with any absolute certainty, as they frequently depend upon fluctuations in the market, and changes in the price of labor and materials, which may take place while the contract is being performed. Yet inasmuch as they may be estimated with reasonable certainty, and their loss is the direct result of the wrong complained of, they are allowed to be recovered. And in the case of *Waters vs. Powers*, 20 Eng. Law & Eq. 410, the rule was extended so as to include profits on a collateral contract which the plaintiffs had entered into with other parties. The court said, " If reasonable evidence is given that the amount of profit would have been made as claimed, the damages may be asked accordingly."

In *Hadley vs. Baxendale*, 26 Eng. Law & Eq., 398, the defendant, who was a common carrier, had neglected to deliver a broken shaft of a mill, which was to serve as a model for the making of a new one, by reason of which the new one was delayed and the mill kept idle for want of it. It appeared that the facts showing that such would be the result of his failure, were not communicated to him, and on that ground the court held that the plaintiffs could not recover the profits which the mill might have made during the delay. But it was held that if those facts had been communicated to him, he would have been liable for the profits. In *Fletcher vs. Tayleur*, 33 Eng. Law & Eq., 187, the action was brought for damages on a failure to complete a vessel at the time contracted for. The vessel was designed for the Aus-

January Term, 1862.

SHEPARD
v.
MILWAUKEE
GAS LIGHT CO.

tralian trade, and evidence was given to show what would have been her probable earnings during the time of the delay; and the jury gave a verdict which evidently included the profits that might have been made during that period. The court refused to disturb the verdict, and though it is stated that no question upon that point had been made at the trial, yet the decision does not seem to rest upon that ground. JERVIS, C. J., suggests that there should be some general rule, and that the damages might be "estimated according to the average per centage of mercantile profits," and adds that such is, "to some extent, the result of *Hadley vs. Baxendale.*" CROWDER, J., quotes *Alder vs. Heighley*, 16 M. & W., 117, in which, he says, the court lay it down as a clear rule, "that the amount which would have been received if the contract had been kept, is the measure of damages if the contract had been broken;" and he then adds, "I cannot say that the damages in this case have been calculated on a false principle."

I think the principle fairly to be derived from these cases is, that the profits lost as a direct result of a breach of contract, may be recovered as damages, where they are not so conjectural and remote as to be incapable of ascertainment with reasonable certainty. And their reasoning seems entirely applicable to this case. The defendant here knew that if it refused gas to the plaintiff, he could get it nowhere else. It stood, therefore, in the same position that the carrier would have been in, in *Hadley vs. Baxendale*, if he had known the plaintiff could have no shaft to his mill until the model was delivered. The defendant, therefore, must be presumed to have contemplated whatever damage would naturally arise from its refusal to furnish the plaintiff with gas. Its obligation to furnish it was, according to the decisions of this court, as clear and imperative as though it had expressly contracted to do it. And it seems to me that the profits of an established business, are quite as capable of being ascertained with reasonable certainty, as the profits to arise from a single contract or adventure. There is, in the case of such business, the experience of the past to serve as a test. And the rule suggested by JERVIS, C. J., in *Fletcher vs. Tayleur*, that

the damages should be estimated " according to the average per centage of mercantile profits," could readily be applied, and would seem just and reasonable. The cases already referred to, seem to me, therefore, applicable here, and to sustain the conclusion that the profits of a business, which are necessarily lost by the wrong or default of another, may, under some circumstances and with proper restrictions, be considered in estimating the damages for the injury.

The following cases also sustain the same conclusion: *Thompson vs. Jackson et al.*, 14 B. Mon., 114; *Davis vs. Talcott*, 14 Barb. (S. C.), 611; *Sewall's Falls Bridge vs. Fisk et al.*, 3 Fost., N. H., 171; *Wade vs. Leroy et al.*, 20 How., 34. It seems to me also to derive very clear support from the following considerations. It is well established that an action exists in many cases for an injury to a person's trade. Actions for slandering one in his trade or profession are of this character; and the damages are based upon the assumption that such slander injures the party's business by diminishing it. But how does that damage him? Clearly, only by depriving him of the profits he would have made by the business, of which he has been wrongfully deprived. So, also, of private actions for a nuisance, the only injury being a diminution of the plaintiff's business. The establishment of a fair or market or ferry near the plaintiff's, so as to withdraw his custom and diminish his profits, are illustrations of this class. 3 Wendell's Black., 218; *Aikin vs. Western R. R. Co.*, 20 N. Y., 370; *Dewint vs. Wiltse*, 9 Wend., 325. In the latter case the plaintiff was allowed to recover the rent of a tavern owned by him, and which became tenantless by reason of the defendant's breach of his covenant to keep a ferry, running to the tavern, supplied with boats for the accommodation of travelers. In *Wilkes vs. Market Co.*, 29 E. C. L., 336, the plaintiff, who was a bookseller, was held entitled to recover for damage to his business, occasioned by the defendant's leaving certain obstructions in the street on which his store was located, for an unreasonable length of time. The very ground of complaint was, that the obstructions diminished his custom, and consequently deprived him of his profits. So also those actions where bankers are held re-

sponsible for damages for not paying their customers' checks,
they having funds on hand, are based on the same idea, that
such refusal tends to injure the plaintiffs' trade. Thus in
*Rolin vs. Steward*, 25 Eng. Law & Eq., 341, the defendant, a
banker, having funds of the plaintiff, had refused payment of
three checks amounting to £111, 13s. There was no proof
of special damage, but the jury returned a verdict of £500.
The court refused to disturb it, on the ground that the re-
fusal had a general tendency to injure the plaintiffs' trade,
and that the jury might properly consider that. The prin-
ciple of that action seems to me very similar to that upon
which this should be sustained. Now all these actions seem
to me to be based upon no other idea than that the plaintiff
had suffered injury by having the profits of his business di-
minished. And if, in all these, an injury to the profits is
capable of being ascertained with sufficient certainty to be
made the ground of damages, I can see no reason why it can-
not be done in actions for a breach of contract, or a wrong-
ful refusal like that now under consideration. For they
may be as certainly ascertained in one class of actions as in
another.

There are two cases that I have found, which, though they
may seem, to some extent, opposed to the conclusions I have
stated, I still think really sustain them. In *Marquart vs. La
Farge*, 5 Duer, 559, the defendant had wrongfully broken up
the plaintiff's business in a restaurant. The plaintiff gave
evidence of the extent of his business, and that " one half
the receipts were profits." The court held the evidence ad-
missible. It said: " Now it was certainly competent to
prove, in some way, the nature and extent of the injury,
*and the value of the business, was a proper subject of estimate for
the jury.*" They then add: ".It may be that a calculation of
possible or probable profits, in view of the ordinary uncer-
tainties of business, would not be allowable." If by this the
court meant to exclude all consideration of the profits that
would have resulted to the plaintiff according to the ordina-
ry course of his business, it seems to me repugnant to what
had previously been expressly allowed. They had allowed
evidence of what the profits had been; they had said that

the jury "must estimate the value of the business," in arriving at the amount of damages. Now I think it is impossible for any jury or judge to do this, without considering the profits of that business. The same remarks seem to me applicable to the case of *Cincinnati vs. Evans*, 5 Ohio St., 594. There the defendant had torn down the front part of the shop of the plaintiff, who was a merchant tailor, thus interrupting his business. The court held that "the rentable value of the building would not be a compensation;" that the defendants "must have contemplated a further injury as the necessary consequence of their acts, and for that further injury he is entitled to recover." They then say that the "supposed or contemplated profits of the business" during the period of interruption, could not be considered as a measure of the injury, and proceed as follows: "Upon the whole, we are of opinion that in addition to the damages done to the building, he was entitled to recover such further sum *as would compensate him for the loss of its enjoyment while the interruption continued.*" And strangely, as it seems to me, they then add that "the profits which might have been realized, by employing his personal services and capital in the prosecution of his business in the injured building during the period for which he was deprived of its use, cannot be recovered." If that is so, why allow him to show "the nature and extent of his business," or "the necessity of using the building for its prosecution?" These matters seem entirely immaterial, except with a view of showing the amount of damage from the interruption of that business. They are material to this purpose only so far as they tend to show how much the plaintiff lost by the interruption. And it is obvious to every mind that he lost the profits he would have made if the interruption had not occurred. How could he prove the "value of the business to him," without showing the amount of profits he would have realized according to its ordinary course? How could that value be estimated without including an estimate of the profits? If there is any process by which it may be done, I confess my inability to perceive it; and it seems to me, therefore, that when the court grants the former and then undertakes to reserve the

latter, the reservation is repugnant to the grant, and void.
It seems to get at the same result by simply calling it by an-
other name.  But whether or not my criticism on these cases is
well founded, I may here remark that they both sustain the
admissibility of all the evidence which was offered by the
plaintiff in this case.  He only showed the nature and ex-
tent of his business, and the tendency of the defendant's
wrongful refusal, to injure that business.  He did not offer to
calculate the amount of profits of which he was deprived,
but left the jury to judge from such facts as both of these
cases held might be shown, what was the extent of the inju-
ry ; though I candidly confess I cannot see why these facts
are held admissible at all, except as a means of showing the
plaintiff's damage in the loss of the profits of his business.
Perhaps many of the cases which seem to sustain the general
rule, that profits cannot be recovered, may be explained up-
on the principle that the plaintiff might, by reasonable dili-
gence, have avoided the loss, or else upon the principle which
*Hadley vs. Baxendale* decided, that the loss grew out of some
unusual and special circumstances, which were not known to
the defendant.  But subject to these qualifications, I think
the authorities fairly sustain the conclusion, that the una-
voidable loss of profits which the party committing the in-
jury must be presumed to have contemplated, may in ac-
tions of this kind, be considered in estimating the damages.

I think, therefore, there was no error in admitting the ev-
idence objected to.

The only other question is, whether there was error in rul-
ing that the plaintiff was entitled to recover damages down
to the time of commencing the suit.  We think there was
none.  It is true, he had not tendered pay for all that
time.  But it was not for want of compliance with the
terms of the *Company* as to pay, that he was refused the
gas.  Their rules did not require pay in advance, but they
reserved the right to demand it, or security, when they deemed
it necessary.  They never demanded either of the plaintiff.
But they refused to let him have gas for refusing to comply
with other terms which they had no right to impose, and
told him he could not have it until he complied with those

January Term, 1862.

terms.    Having placed themselves upon that position, the plaintiff had a right to assume that they stood there, until notified to the contrary.    Their refusal was a continual refusal, until retracted.    And we think it would be unreasonable to say that the plaintiff was bound to repeat his demand after such a refusal, in order to entitle him to damages.    His first demand was a sufficient indication to the *Company* that he was ready to comply with their terms as far as payment was concerned, and if they afterwards changed their minds, they should have notified the plaintiff accordingly.

The judgment is affirmed, with costs.