(62 Misc. Rep. 37.)

## In re WHEELER.

(Supreme Court, Special Term, Kings County.   December, 1908.)

1. FERRIES (§ 28*)—FRANCHISE TO CITY OF NEW YORK—DUTY TO OPERATE.

The Montgomerie charter of the city of New York, dated January 15, 1730, granted to the city authority to establish ferries between New York and Long Island, and a special franchise to operate particular lines on specified routes was conferred on the city by section 37 of that charter. *Held*, that the acceptance of such franchise imposed on the city the duty of operating the same for public service, modified by the powers granted by the Legislature prescribing the method in which such franchise shall be operated.

[Ed. Note.—For other cases, see Ferries, Cent. Dig. § 75; Dec. Dig. § 28.*]

2. MANDAMUS (§ 80*)—DUTY OF CITY TO OPERATE FERRIES.

The duty of the city of New York to maintain and operate ferries between the boroughs of Brooklyn and Manhattan in accordance with franchises granted by Montgomerie Charter Jan. 15, 1730, and subsequent legislation may be enforced by mandamus.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. § 137; Dec. Dig. § 80.*]

3. MANDAMUS (§ 23*)—DUTY TO OPERATE FERRIES—ACTION BY PRIVATE CITIZEN.

A private citizen has sufficient interest in the duty of a city to operate a ferry franchise to entitle him to bring mandamus.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. §§ 55, 56; Dec. Dig. § 23.*]

4. MANDAMUS (§ 84*)—LEASES OF FERRY FRANCHISE.

Laws 1905, p. 1201, c. 533, amending Greater New York Charter (Laws 1897, p. 298, c. 378) § 826, authorizes the city to offer leases of ferries between Brooklyn and Manhattan at public auction, and mandamus will be granted to compel the city so to do, provided that within a reasonable time, to be fixed, such ferries are not leased by private agreement, or proceedings are not begun to acquire the necessary land for the purpose of municipal operation, as authorized by section 824a of the charter (Laws 1907, p. 983, c. 450).

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. § 181; Dec. Dig. § 84.*]

Application of Everett E. Wheeler for writ of mandamus to the city of New York and others. Writ granted.

John C. Tomlinson, for the motion.
Louis H. Hahlo, opposed.

BLACKMAR, J. This is an application for a peremptory writ of mandamus requiring the city of New York to maintain and operate five ferries running between the boroughs of Brooklyn and Manhattan.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Four of the ferries have their Brooklyn terminal at the foot of Broadway in the section of the city known as Williamsburg, and their Manhattan termini at Roosevelt street, Grant street, Twenty-Third street, and Forty-Second. street, respectively. The other runs from Grand street, Brooklyn, to Grand street, Manhattan. These ferries have been operated for many years by the Brooklyn Ferry Company of New York as lessee, which owned the Brooklyn termini and all the boats and equipment. Since the bridges were opened to public traffic these ferries have been operated at a loss and the rental has fallen into arrears. Because of such losses default was made by the operating company in payment of the interest on its bonded indebtedness, an action was brought to foreclose the mortgage, and all the property of the company, except the unexpired lease of the Forty-Second Street ferry, all other leases having expired, was, on July 24, 1908, sold to the New York Terminal Company. Since that date the ferries have been operated by one William O. Madden, who is lessee of the New York Terminal Company. He was about to permanently discontinue them on July 31, 1908, when stopped by an injunction order of this court granted in another action. Other material facts will be stated in the course of this opinion.

The applicant claims that the city owns the ferry franchises in perpetuity, that such ownership imposes on it the duty to maintain and operate them, and that such duty should be enforced by a writ of mandamus. The city claims that it owes no duty of operation and can continue or discontinue the ferries at will. An inquiry into the nature of the title of the city to ferry rights in general and to these five ferries in particular seems to be necessary.

The Dongan charter of 1686 granted certain ferry franchises to the city; but those rights have been superseded by the broader provisions of the Montgomerie charter, and the language of the grant need not be here quoted. The ferry franchise conferred by the Cornbury charter of 1708 related only to ferries having their Long Island termini between Wallabout and Red Hook. On January 15, 1730, the Montgomerie charter was granted. As I have reached the conclusion that the ferries in question were established by the city under powers derived from this charter, I quote that part which refers to ferries, viz.:

"Sec. 15. And we do further, for us, our heirs and successors, give, grant and confirm unto the mayor, aldermen and commonalty of the said city of New York, and their successors forever, that the common council of the said city, for the time being, or the major part of them (but no other person or persons whomsoever, without the consent, grant or license of the said common council of the said city, for the time being, or the major part of them) from time to time, and at all times hereafter, shall and may have the sole, full and whole power and authority of settling, appointing and directing, and shall and may settle, appoint, establish, order and direct such and so many ferries around Manhattan's Island, alias New York Island, for the carrying and transporting people, horses, cattle, goods and chattels from the said Island of Manhattan to Nassau Island, and from thence back to Manhattan's; and also from the said Island Manhattan's to any of the opposite shores all around the same island, in such and so many places as the said common council, or the major part of them, shall think fit, who have hereby, likewise, full power to let, set or otherwise dispose of all or any of such ferries to any person or persons whomsoever. * * *"

"Sec. 37. And we do * * * give, grant, ratify and confirm unto the said mayor, alderman and commonalty of the city of New York, and their successors forever, all those the now City Hall * * * and the ferry and ferries on both sides of the East River, and all other ferries now and hereafter to be erected and established all round the Island Manhattan's, and the management and rule of, and all fees, ferriages and perquisites to the same, or any part thereof belonging." etc.

On October 14, 1732, an act passed by the colony of New York provided that the city "shall and may establish and keep one or more ferries between the said city of New York and the island of Nassau for the better and more easy transportation of goods and passengers over the said ferry." This act also prohibited others from "presuming to erect and keep" a ferry between the islands of New York and Nassau without leave of the city. Article 36 of the first Constitution of the state, passed April 20, 1777, saved all charters to bodies politic made by the king prior to October 14, 1775, and chapter 106, p. 233, of the Laws of 1801 also contained a provision that the city "may establish and keep one or more ferries between the said city and the island of Nassau."

Such were the rights of the city of New York to establish and keep ferries on May 14, 1845. On that day was passed chapter 352, p. 422, of the Laws of 1845, entitled "An act to establish and regulate ferries between the city of New York and Long Island," which purported to repeal the ferry clauses of the ancient charters in so far as the power to establish ferries to Long Island was unexecuted and vested the power in commissioners to be appointed by the Governor. If this act was valid, the city had thereafter no authority under the ancient charters to establish ferries between Manhattan and Long Island; for, although the act of 1845 was expressly repealed by chapter 537, p. 750, of the Laws of 1881, yet that law contained a clause that the repeal should not revive any provision repealed or superseded by the act thereby repealed, and the provisions of subsequent charters continuing the ancient charters in force do not purport to revive any portions of them which had been repealed.

The record does not show when the ferries in question were established; but, as this is the part of the history of the city of New York, I think the court may take judicial notice that one was established before and four after 1845. The question whether four of the five ferries were established under the Montgomerie charter, therefore, depends on whether the act of 1845 was effective to repeal the ancient charters as to the unexercised power to establish ferries. If the power to establish ferries granted by the Montgomerie charter was a property right in the nature of a perpetual franchise, it was, and is, protected by the United States Constitution against impairment by legislative act, and the act of 1845 did not affect it. If, however, this power was granted to the city as a function of government and as a delegation of political power to a municipal corporation, it may be resumed by the state, and the act of 1845 had this effect.

The case of Benson v. Mayor, 10 Barb. 223, did not decide this question, but only that ferries already established were the property of the city and could not be resumed by the Legislature. Justice Barculo

states in his opinion in this case, written in December, 1850, that there was pending and undetermined an action brought by the city to test the constitutionality of the act of 1845. This case came on for trial before Justice Roosevelt in the Special Term of this court in June, 1852, who decided that the law of 1845 was unconstitutional, and judgment was entered perpetually restraining the commissioners from granting ferry licenses; but the case is not reported. See Opinions of the Counsel to the Corporation (from 1849 to 1860) p. 122. This unreported decision of Justice Roosevelt is mentioned in 49 How. Prac., at page 253, in 32 Barb., at page 120; in Hoffman's Treatise, p. 136; in Gerard's City Water Rights, Streets & Real Estate, p. 287; and the scope of the decision clearly stated in Davies' Laws of New York Relative to the City, at page 1265.

On the other hand, in People v. Mayor, 32 Barb. 102, Justice Hogeboom, at Special Term, expressed the opinion that the power to establish ferries in futuro granted by the ancient charters was a public or governmental power, revocable so far as it remains unexecuted, and that the act of 1845 was a constitutional exercise of such power of revocation. As, however, he held that the act of 1845 had been repealed by implication by the charter of 1857 (Laws 1857, p. 874, c. 446), this comment was unnecessary to his decision and therefore a dictum.

In Mayor v. N. Y. & Staten Island Ferry Co., 49 How. Prac. 250, decided in 1875, Judge Van Vorst, of the Superior Court of the City of New York, wrote that the right to establish ferries in futuro given by the Montgomerie charter was a property right, although he intimated that it was not necessary to decide such question.

In Aikin v. Western R. R. Corp'n, 20 N. Y. 370, the court, in considering similar language in the Dongan charter of the city of Albany, intimated that such charter conveyed a vested property right.

In Darlington v. Mayer, 31 N. Y. 164, 203, 88 Am. Dec. 248, Judge Denio, speaking of Justice Barculo's opinion in the Benson Case, says:

"So far as the opinion argues that the Legislature cannot interfere with the power conferred by the charter on the corporation in regard to ungranted ferries, I should not be able to concur in all that is said."

In Mayor v. Starin, 106 N. Y. 1, 12 N. E. 631, the court held that the Montgomerie charter conferred on the city an exclusive ferry franchise all around the city to the opposite shores The actual decision was that the grant in the Montgomerie charter included the right to establish ferries to Staten Island, and that a ferry not authorized by the city should be enjoined. The act of 1845 did not purport to relate to ferries to Staten Island, but only to those between New York and Long Island, and therefore was not considered.

The question, therefore, so far as I can learn, has never been determined by the courts except in the unreported decision by Justice Roosevelt.

In 1836 Chancellor Kent published the charter of the city of New York, with notes and a treatise on the powers and duties of the mayor, alderman, and assistant alderman. He devotes note XXX (page 138) to a consideration of sections 15 and 37 of the Montgomerie charter, and reaches the conclusion that a grant of the right to establish ferries

in futuro is as much a grant of a corporate franchise partaking of the nature of private property as the grant of a ferry already established and is beyond the reach of "gratuitous legislative resumption." Hoffman, in his treatise on the estates and rights of the corporation of New York as proprietor, considered this question at great length and reached the same conclusion. See, also, to the same effect Davies on Laws of New York Relative to the City (1855) p. 226

It seems to me that the weight of authority is to the effect that the right to establish ferries in futuro granted by the Montgomerie charter was a franchise, an incorporeal hereditament, and exists unimpaired by the law of 1845, and that the ferries in question were established under the authority of that charter. Under section 15 the ferry franchise is an exclusive right to establish ferries all around the island of Manhattan. This is a single right by virtue of which all ferries are located. Section 37, however, plainly refers to ferries to be established on definite routes and in terms grants these ferries to the city. I believe, therefore, that the city has a perpetual exclusive franchise to operate these five distinct and separate ferries each on the route upon which it was established and over which it has been operated by the city through its lessees, and that the right is the same as if each had been separately conveyed by the state to and accepted by the city.

Having considered the nature of the title of the city to these ferries, it remains to determine what duty, if any, the city owes in respect to their maintenance and operation.

Hall, Chief Justice, said in Payne v. Partridge, 1 Shower, 231 (1794):

"If a ferry were granted at this day, he that accepts such grant is bound to keep a boat for the public good."

In Charles River Bridge v. Warren Bridge et al., 11 Peters, 420, 621, 9 L. Ed. 773, Justice Story, quoting from Blackstone, says:

"If a ferry is erected on a river so near another ancient ferry as to draw away the custom, it is a nuisance to the old one; for, where there is a ferry by prescription, the owner is bound always to keep it in repair and readiness for the ease of the king's subjects."

He also says on page 629 of 11 Pet. (9 L. Ed. 773):

"In the case of a ferry there is a public charge and duty. The owner must keep the ferry in good repair upon the peril of an indictment. He must keep sufficient accommodations for all travelers at all reasonable times."

In Mayor v. Starin, 106 N. Y. 1, 12, 12 N. E. 631, 633, Judge Earl says:

"The owner of a ferry franchise is bound to exercise his franchise for the public convenience, and if he fails to do so his franchise may be forfeited by the sovereign for nonuser, and at common law he could be indicted. * * * So, also, if the owner of an exclusive ferry franchise does not establish sufficient accommodations for the public, he may be proceeded against by the sovereign and compelled to discharge his public duties, or his franchise may be forfeited."

In People v. Assessors, 111 N. Y. 505, 510, 19 N. E. 90, 91, 2 L. R. A. 148, Judge Andrews says:

115 N.Y.S.—39

"The ferry franchise was conferred for a public use. This is clearly recognized in all the charters. Its acceptance by the city imposed a duty corresponding with the privilege granted."

See, also, Warner v. Lord Lambert & Mfg. Co., 123 Ky. 103, 93 S. W. 650, 12 L. R. A. (N. S.) 667; Broadnax v. Baker, 94 N. C. 675, 55 Am. Rep. 633; Letton v. Goodden, 14 L. T. (N. S.) 296; Hackett v. Wilson, 12 Or. 25, 6 Pac. 652.

The position of the city of New York (I quote from the points submitted by the corporation counsel) is that:

"The ferries are the private property of the city, and as such the city can continue or discontinue them at will."

This is equivalent to an assertion that the city owes no duty whatever to the public. The rule of law that the acceptance of a ferry franchise imposes a duty of operation is no modern doctrine. It existed at the time of the Montgomerie charter. The grantor was the crown of Great Britain acting through the governor and council of the colony of New York. The sovereign was as much concerned with the wellbeing of the residents of Long Island and Staten Island as of the city of New York. The grant of the ferry rights was by its terms vested exclusively in the city of New York. All other persons were prohibited from maintaining any ferry without the consent of the city. The ferriage and tolls were forever granted to the city of New York and were one of the principal sources of its revenue. The only way in which an inhabitant of Long Island could lawfully cross the East River was by paying tribute to the city of New York or keeping a boat of his own. Now, if this exclusive ferry franchise "all round the city of New York to the opposite shores" was the private property of the city, unburdened by any obligation to the public, the city had the right at will to isolate Long Island and injure or ruin its settlements by destroying all means of passing therefrom to Manhattan Island and preventing for all time the establishment or operation of any public ferry over the East River. I cannot think that such was the intent of the sovereign. It will not do to say that, if the city of New York should deliberately try to ruin the settlement on Long Island by discontinuing all ferries, the sovereign could forfeit the franchise for nonuser; for, if there is no obligation to the public to keep the ferry in operation, there is no nonuser. Nonuser of a corporate franchise means the failure to perform the obligation to the public.

The Dongan charter authorized the establishment of ferries "necessary, needful, and convenient for the inhabitants of the said city and Manhattan's Island aforesaid, and for all travellers and passengers there." The Cornbury charter gave power to establish ferries "for the ease and accommodation of transporting of passengers, goods, horses and cattle between the said city of New York and the said [Long] Island." The Montgomerie charter provided that the common council should have power to establish ferries "for the carrying and transporting people, horses, cattle, goods and chattels from the said island of Manhattan to Nassau Island, and from thence back to Manhattan's; and also from the said Island Manhattan's to any of the opposite

shores all around the same island." These are expressions of an intent that the purpose of the grant was the benefit of the traveling public. These charters also contain important and valuable grants of property, including lands, buildings, docks, the right to collect ferriage, and other property which are some of the considerations supporting the assumption of the duty by the city.

But the extent of the duty is limited by the powers granted by the Legislature prescribing the manner in which such franchise shall be operated. The duty arose from the grant and acceptance of the franchise. This duty is to the public, and there is no doubt that the Legislature representing the public has power to modify, curtail, or release it. The city of New York has no powers except such as are granted to it by the Legislature in its various charters. It cannot act, except as authorized by the law of its creation. It seems to me to follow that any limitation on the power of the city to operate these ferry franchises is also a limitation upon the duty of operation which it owes to the public. If the state should deprive the city of the power of performing such duty it would be equivalent to such release. If the state has seen fit to vest in the city or any of its officers or boards a discretionary power as to the operation of the ferries, then the duty of operation may be performed or not at the discretion of the city. This doctrine negatives the proposition that there can rest on the city a general duty of operation broader than a power of performance granted in the charter. The duty itself is necessarily limited and measured by the statutory restrictions regulating its performance. ·

The Montgomerie charter seems to contemplate the operation of the ferries through the lessees or grantees. In section 15 the granting clause is followed by the words:

"Who [i. e., the city] have hereby, likewise, full power to let, set or otherwise dispose of all or any of such ferries to any person or persons whomsoever."

The act of October 14, 1732 (Colonial Laws 1719–1732, p. 807, c. 593), authorizes the city "to establish and keep one or more ferries between the said city of New York and the island of Nassau." The word "keep," although perhaps equivalent to "maintain" (see Benson v. Mayor, 10 Barb. 223), does not necessarily involve the grant of authority for municipal operation. Section 7 of the act of April 12, 1853 (Laws 1853, p. 411, c. 217), and section 41 of the act of April 14, 1857 (Laws 1857, p. 888, c. 446), both required that all ferries should be leased. I find nothing in the charter of 1873 (Laws 1873, p. 484, c. 335) nor in the consolidation act of 1882 (Laws 1882, p. 1, c. 410), as amended from time to time, regulating the manner of operating the ferry franchises, unless contained in the general power to lease or sell city property.

I have cited these prior charters to show that the method of operating ferries from the earliest times has been by leases to operating companies. The charter of Greater New York (Laws 1897, p. 298, c. 378, § 826) authorizes the commissioner of docks, with the approval of the commissioners of the sinking fund, to lease the ferry franchises. This letting is required to be at public auction, unless the commissioners of

the sinking fund shall unanimously decide, upon the recommendation of the commissioner of docks, that such public letting is not for the best interests of the city, in which case the leases may be made by private agreement. The leasing by private agreement, therefore, can only be made after the determination by the commissioners of the sinking fund that public letting is not for the best interests of the city. Therefore a letting by private agreement resting on this judicial determination cannot be controlled by mandamus. People ex rel. Harris v. Commissioners, 149 N. Y. 26, 43 N. E. 418.

Down to 1905 I find no authority to operate ferries except through leases or grants. Chapter 533, p. 1201, of the laws of 1905, amends section 826 of the charter by providing that, after the determination by the commissioners that the best interests of the city will not be promoted by a leasing at public auction, it shall be lawful to acquire the necessary real estate, plant, or equipment for such ferry, including necessary terminal facilities and approaches upon the water front in the borough of Richmond or the borough of Brooklyn between Thirty-Eight and Sixtieth streets, and to provide for the maintenance or operation thereof. It is my opinion that this amendment confers broadly upon the city the power to acquire lands necessary for ferry purposes by condemnation and to directly operate such ferries without the intervention of lessees. I do not think that the power to acquire lands is confined to the territorial limits mentioned. Before this amendment section 826 governed generally the establishment and leasing of ferries. It applied to all ferries. The amendment of 1905 did not introduce a new section, a new clause, or even a new sentence; but it added to the sentence which provided for leasing by private agreement, and which was plainly applicable to all ferries, words authorizing the acquisition of land and municipal operation. The fact that the amendment reads that the real estate, property, plant, or equipment which the city is authorized to acquire includes necessary terminal facilities and approaches upon the water front in Richmond or in specified portions of the borough of Brooklyn does not exclude real estate in other localities from the operation of its provisions. But such power to acquire lands and property and directly operate cannot be exercised, unless preceded by the determination of the commissioners of the sinking fund, on the recommendation of the commissioner of docks, that a public letting would not be for the best interest of the city. It is perhaps not out of place to say, in passing, that the answering affidavits, by which I am bound, show that the Brooklyn termini are not owned by the city, but by the purchaser from the lessee at the foreclosure sale; but the source of the title, the relation of the land to the streets, and whether it is burdened by any servitude to public use do not appear.

Chapter 450, p. 983, of the Laws of 1907 adds a new section to the charter of Greater New York known as section 824a. This section authorizes the commissioner of docks, with the approval of the commissioners of the sinking fund, and in his discretion, to acquire by purchase any ferry and the necessary property and to maintain and operate the same. This power is plainly discretionary. The analysis of the statute seems to show that the right to acquire ferries and the

necessary property by purchase and to operate the same rests in discretion, and that the right to let by private agreement or to acquire and operate under section 826 depends on the determination of the commissioners of the sinking fund that public letting is not for the best interest of the city. The duty to let at public auction is ministerial and absolute, unless one of the other methods of operation is adopted.

The next question is whether the performance of this duty can be enforced by writ of mandamus. The Montgomerie charter (section 15) vests in the city the discretion to determine how many and where ferries shall be located. See, also, section 818 of the charter of Greater New York. The courts cannot, therefore, require the establishment of new ferries by mandamus or any other judicial action, no matter what the necessity for them may be. Chicago & Eastern R. R. v. People ex rel. Langhans, 222 Ill. 396, 78 N. E. 784; N. P. R. R. v. Dustin, 142 U. S. 492, 12 Sup. Ct. 283, 35 L. Ed. 1092. But the question here is whether a duty rests on the city to maintain these particular lines, as distinguished from a general duty to maintain ferries between such points as in the opinion of the city public convenience requires. The general discretionary power to establish ferries is granted by the fifteenth section of the Montgomerie charter. It is a ferry franchise in solido between Manhattan Island and the opposite shores. Mayor v. Starin, 106 N. Y. 1, 12 N. E. 631. But when the ferries are once established there is a specific franchise for such lines. This is granted by the thirty-seventh section of the charter in the following words:

"And we do by these presents * * * give, grant, ratify and confirm unto the said mayor, aldermen and commonalty of the city of New York, and their successors forever, * * * the ferry and ferries on both sides of the East River, and all other ferries now and hereafter to be erected and established all round the island of Manhattan's."

The framers of the charter must have contemplated that the city would act under the fifteenth section in establishing ferries by definite lines. One reason why the broad powers conferred by section 15 were given to a municipal instead of a private corporation was that a municipal corporation would, in establishing the ferries, be moved rather by considerations of public good than of profit. Discretion as to the location of new ferries was therefore wisely vested in the city. But as to ferries already established a different condition is presented. The growth and development of the city and of the connected territory on the opposite shores are largely influenced by the existence of the ferries. They are continuations of highways. Their cessation or relocation would seriously injure that portion of the community which had established its business and located its residences relying on these means of transportation. Section 37, therefore, expressly granted to the city all ferries thereafter "to be erected and established." The rights and duties of the city as to the ferries once established are the same as if they had been specifically granted by the sovereign and accepted by the city. The duty of the city to the extent indicated is specified as to the established routes. The rule is well established that mandamus is the proper remedy to compel a corporation to perform a duty imposed on it by its charter. State v. Hartford & New Haven

R. R., 29 Conn. 538; People ex rel. Green v. Dutchess, etc., R. R., 58 N. Y. 152; People ex rel. Keene v. Board of Supervisors, 142 N. Y. 271, 36 N. E. 1062; Attorney General v. City of Boston, 123 Mass. 460; People v. Rome, W. & O. R. R., 103 N. Y. 95, 8 N. E. 369; People v. Albany & Vt. R. R., 24 N. Y. 261, 82 Am. Dec. 295; People ex rel. Bridgeton v. Bridgeton & Melville Traction Co., 62 N. J. Law, 592, 43 Atl. 715, 45 L. R. A. 837; People v. N. Y. C. & H. R. R. R., 28 Hun, 543; People v. Northern Central R. R., 164 N. Y. 289, 58 N. E. 138; The King v. Severn & Wye R. R., 2 B. & A. 646.

The applicant, a private citizen, has sufficient interest in the question to entitle him to promote the proceedings. This is established by abundant authority. People ex rel. Case v. Collins, 19 Wend. 56; People ex rel. Stephens v. Halsey, 37 N. Y. 344; People ex rel. Waller v. Supervisors, 56 N. Y. 249; Application of Baird v. Supervisors, 138 N. Y. 95, 33 N. E. 827, 20 L. R. A. 81; Savannah, etc., Canal Co. v. Shuman, Relator, 91 Ga. 400, 17 S. E. 937, 44 Am. St. Rep. 43; Union Pac. R. R. v. Hall, 91 U. S. 343, 23 L. Ed. 428; High on Extraordinary Legal Remedies (3d Ed.) § 431; Dillon on Mun. Corp. (4th Ed.) vol. 2, § 865.

But, even if the court has power to issue its writ of mandamus to compel the city to act, it remains to be considered whether the facts shown in this record require that the writ should issue. The writ of mandamus rests largely in judicial discretion. Not only must the applicant show a clear legal right to it, but he must convince the court that considerations of justice require it to act. People ex rel. Sherwood v. Board of Canvassers, 129 N. Y. 360, 29 N. E. 345, 14 L. R. A. 646.

It is contended that the writ should not issue because the construction of bridges and tunnels has rendered the ferries no longer a public necessity and convenience and has made their operation unprofitable. The record shows that during the last five years these ferries have carried over 77,000,000 passengers and over 5,000,000 vehicles, and that the inhabitants of a large and important area of both the boroughs of Manhattan and Brooklyn are more conveniently served by the ferries than by bridge and tunnels. The necessity for the ferries may be further reduced by the construction of the new Manhattan Bridge; but the extent to which the new bridge will reduce the usefulness of the ferries is not shown, nor in the nature of things can it be shown. The exhibits introduced by the applicant show the territorial relation of the bridges to the ferries, and judicial notice may be taken of the fact that the Manhattan approaches to the Williamsburg Bridge are at a distance from the ferry termini. No bridge has yet been built which does not leave a large area of land covered with buildings mostly used for business purposes between its approaches and the river side. I think that upon the record before me it sufficiently appears that these ferries are still a public convenience and necessity.

It is alleged in the opposing affidavit that the ferries are operated at a revenue deficit, but the extent of the deficit is nowhere stated. It would have been possible to show the financial results of their operation, but neither party has attempted it. Whether the deficit is caused by the rental paid the city, by interest or dividend charges, or by the

difference between the revenue from tolls and the expense of operation, does not appear. The city has established under the ancient charter and owns and operates directly or through lessees about 30 ferries. The revenue from all these ferries is large. Possibly some, and these among them, may be unprofitable. But it is not alleged that the operation of all the ferries created under the franchise granted by these charters is unprofitable. It appears that the receipts from ferry rentals during the 10 years from 1898 to 1907, inclusive, amounted to $3,647,574, and that the rental from the five ferries involved in this proceeding for the same term was $453,396. It does not appear what, if any, expense is chargeable against this sum. It is shown that certain laws regarding hours of labor and rate of wages increase the expense of a ferry operated by the city. But this is not of controlling importance, for it does not appear that the ferries may not be leased on less burdensome terms. The fact that the exercise of a franchise, especially the partial exercise of a franchise, becomes unprofitable, does not per se relieve the owner from the duty of operation.

The corporation counsel claims that a peremptory writ cannot issue because allegations in the moving papers are denied. But in reaching my conclusion I have not considered any allegations in the moving papers which are denied, and I have taken as conclusive all statements of fact made in the opposing affidavits. The court is not concluded by allegations of law. Haebler v. N. Y. Produce Exchange, 149 N. Y. 414, 44 N. E. 87.

I have reached the conclusion that the ferries in question were established pursuant to the authority contained in the Montgomerie charter; that by the provisions of section 37 of that charter a special franchise to operate these particular lines on the specified routes was conferred upon the city; that the acceptance of such franchise imposed upon the city the corresponding duty of operating the same for the public service; that such duty is modified and limited by the powers granted by the Legislature prescribing the method in which such franchise shall be operated; that the performance of this duty may be enforced by a writ of mandamus; that the plaintiff has shown an interest in the question which authorizes him to apply for the writ; and that the undisputed facts justify the court in exercising its discretion in granting the writ.

The motion for a writ of mandamus is granted, so far as to require the city to offer leases of these ferries at public auction pursuant to the provisions of section 826 of the charter, provided that within a time after the issuance of the writ to be fixed on the settlement of the order the same are not leased by private agreement or proceedings are not begun to acquire the necessary land for the purpose of municipal operation as authorized by said section, or the property necessary for municipal operation is not acquired by purchase as authorized by section 824a. The return to the writ may be made at the April Special Term of this court. The order may provide that the issuance of the writ may be stayed for 10 days after entry.

It may be that, as the city does not own the Brooklyn termini, a bidder will not be secured when the lease is offered, and the writ will

therefore be ineffective. But the court will have exhausted its power to compel a recognition of its duty by the city. When the Legislature conferred on the commissioners of docks and of the sinking fund discretionary power to determine when ferry franchises should be let by private agreement, or the necessary property acquired by purchase or condemnation, and the ferries municipally operated, it withdrew such matters from the power of the courts. Further remedy must be sought either in the voluntary action of the city or in the Legislature.

Motion granted as indicated, with $50 costs. Settle order on notice.