tiff ought to have a verdict on this trial because of what had occurred on a former trial. It was deliberately calculated to arouse hostility towards the defendants and obtain a verdict based on prejudice, instead of reason. However good a litigant's cause of action may be, a verdict recovered under such circumstances ought not to stand. Courts of justice exist for the purpose of securing a fair determination of controversies. The judgment appealed from lacks that fundamental essential.

The judgment and order appealed from should be reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur.

WURSTER et al. v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, Second Department.   January 26, 1910.)

On reargument. Affirmed.

For opinion below, see 115 N. Y. Supp. 192. See, also, 118 N. Y. Supp. 1151.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, THOMAS, and RICH, JJ.

Nathaniel A. Elsberg (Chase Mellen and Francis Woodbridge, on the brief), for appellants.

Terence Farley (Theodore Connoly and Louis H. Hahlo, on the brief), for respondents.

PER CURIAM.   Order affirmed on reargument, with $10 costs and disbursements, on the opinion of Mr. Justice Blackmar at Special Term, 115 N. Y. Supp. 192.

WOODWARD, J. (dissenting).   The plaintiffs, as resident taxpayers, bring this action to restrain the city of New York from discontinuing five East River ferries. A temporary injunction was granted, and on a motion to continue the injunction pendente lite the court denied the motion and dissolved the temporary injunction. From this order the plaintiffs appeal to this court, and the broad question to be determined upon this appeal is the right of these plaintiffs to maintain the action; for, if the action is maintainable, it is not to be doubted that it is their right to have the ferries kept in operation pending the trial.

The city of New York, under its ancient charters, ratified and confirmed by constitutional provisions, was granted certain rights in the ferries which were or might be established in and around Manhattan Island, and it is not seriously questioned that, whatever these rights were, they still exist. The plaintiffs, as taxpayers, under the provisions of chapter 301 of the Laws of 1892, urge upon this appeal that they are entitled to maintain this action to "prevent any illegal official act on the part of any such officers, agents, commissioners or other persons, or to prevent waste or injury to, or to restore and make good, any property, funds or estate of such county, town, village or municipal corporation" (section 1, c. 301, Laws of 1892), and if these

ferries are the property of the city of New York we see no reason for disagreeing with this contention. The language of the statute is broad. It is a remedial statute, entitled to liberal construction for the purposes of its enactment, and if the defendant has parted with, or attempted to part with, any right or interest in such ferries by abandonment or otherwise, it is the province of the act to permit an action to "prevent any illegal official act  *  *  *  or to prevent waste or injury to, or to restore and make good, any property, funds or estate," etc.

Clearly there is an injury to these ferries if they are discontinued; there is a waste of property, in contemplation of law, if it is abandoned and permitted to deteriorate; and the provision of the statute that the taxpayer is entitled to compel the defendant to "restore and make good any property," etc., indicates that it was the purpose of the Legislature to enable a taxpayer to maintain an action to preserve the rights of the municipality in any of its property, even though the preservation of such rights should involve the municipality in expense. No one would seriously urge that the city of New York could abandon its municipal buildings, though it costs hundreds of thousands of dollars annually to maintain them, and if it should be suggested that the city of New York could abandon its subways simply because its lessee refused to renew its leases, and because it might not be profitable to the municipality to operate them, we fancy there would be no trouble in permitting a taxpayer to maintain an action to preserve the subways and to compel their operation, even at a loss in the operating account. We are equally persuaded that, if the city of New York should attempt to discontinue any of its streets or highways the title of which is in the municipality, this court would not hesitate to sanction an action by a taxpayer to prevent such waste of the property of the municipality, and the mere fact that the temporary injunction operated to compel the municipality to act would not be considered as a fatal objection to such relief.

While the ancient charters of the city of New York all refer to ferries, it does not appear to be necessary to go back farther than the Montgomery charter of 1730, which recites, ratifies, and confirms the previous charters, for a complete view of the relations of the city of New York to the ferries in question, and it is interesting and instructive to know that the same clause of the charter which provides broadly for the ferry franchise in a like manner provides for the streets, highways, alleys, etc., which our courts have long maintained are held in trust for the public. People v. Kerr, 27 N. Y. 188; Matter of N. Y. C. & H. R. R. Co., 77 N. Y. 248, 257. We quote from the Montgomery charter (2 Colonial Laws of New York, p. 613) as follows:

"And we do further for us our Heirs and Successors give grant and confirm unto the Mayor Aldermen and Commonalty of the Said City of New York and their Successors forever that the Common Councill of the Said City for the time being or the Major part of them (but no other person or persons whomsoever without the Consent grant or Lycense of the Said Common Councill of the Said City for the time being or the major part of them) from time to time and at all times hereafter shall and may have the Sole full and whole power and Authority of Setling appointing Establishing Ordering and directing and

Shall and may Settle appoint Establish Order and direct Such and So many fferrys round Manhattans Island alias New York Island for the carrying and transporting people Horses Cattle Goods and Chattells from the Said Island of Manhattans to Nassau Island and from thence back to Manhattans and also from the Said Island Manhattans to any of the opposite Shores all round the Same Island in Such and So many places as the Said Common Councill or the major part of them Shall think ffit who have hereby likewise full power to Lett Sett or otherwise dispose of all or any of such fferys to any person or persons whomsoever and the rents Issues proffits fferriages ffees and other advantages arising and accrewing from all and every Such fferrys we do hereby ffully and ffreely for us our Heirs and Successors give and grant unto the Mayor Aldermen and Commonalty of the City of New York aforesaid and to their Successors fforever to have take hold and enjoy the Same to their own use without being accountable to us our Heirs or Successors for the Same or any part thereof And we do ffurther for us our Heirs and Successors give grant ratify and Confirm unto the Said Mayor Aldermen and Commonalty of the City of New York and their Successors forever that the Common Councill of the Said City for the time being or the major part of them have and from time to time and at all times hereafter forever Shall have full power Lycense and Authority not Only to Establish appoint Order and direct the making and laying out of all other Streets Lanes Alleys high ways watercourses and bridges not already made or laid out but also the altering amending and repairing all Such Streets Lanes Alleys highways water courses and bridges heretofore made or laid out or hereafter to be made or laid out in and throughout the Said City of New York and the Island of Manhattans in such manner as the Said Common Councill for the time being or the major part of them Shall think or Judge to be necessary and Convenient for all Inhabitants and Travellers there."

That is, the mayor, aldermen, and commonalty of the city of New York were not only vested with all of the rights in the ferries, but they were given "full power Lycense and Authority not Only to Establish appoint Order and direct the making and laying out of all other Streets Lanes Alleys," etc., but to amend, alter, and repair the same, so that it is entirely clear that the city of New York was given these ferry rights in connection with its rights in respect to the highway system of Manhattan Island. They constituted a part of "all other streets, lanes," etc., and the court in Matter of N. Y. C. & H. R. R. Co., supra, 77 N. Y. 257, says that "the piers at the ends of the streets and avenues are mere extensions of the same, the title to which is vested in the corporation for the benefit of the public," recognizing the relation of these adjuncts of a ferry as a part of the highway system. It was likewise said by the court in Radway v. Briggs, 37 N. Y. 256, 258, that the city of New York, being authorized to collect wharfage, was charged with the correlative duty of keeping the wharf in repair, this being a public pier or part of the highway; and in Charles River Bridge v. Warren Bridge, 11 Pet. 420, 639, 9 L. Ed. 773, the court, in speaking of bridge and ferry franchises, says:

"Such grants are made for the public accommodation; and pontage and passage are authorized to be levied upon travelers, which can only be by public authority; and, in return, the proprietors are bound to keep up all suitable accommodations for travelers, under the penalty of indictment for their neglect. The tolls are deemed an equivalent for the burden, and are deemed exclusive, because they might not otherwise afford any just indemnity."

This is the common law on this subject, and that the city of New York was regarded as the proprietor, charged with the common-law

duty, is manifest from the recital in chapter 593 of the Laws of 1732 (2 Colonial Laws of New York, p. 807) that:

"Whereas the Rates and Prices of the Ferriage for Men, Horses, Cattle, Grain and all Other Goods Transported Over the Ferry between the City of New York and the Island of Nassau were heretofore Regulated by the Mayor, Aldermen and Commonality of the said City to whom that Ferry Belongs," etc.

These ferries belonging to the city of New York, and the defendant being now engaged in operating a portion of them, accepting tolls for the service, and such ferries constituting a part of the system of highways of the city of New York as now constituted, it would seem to be its duty to continue the operation of all of them, unless expressly authorized to discontinue the same by the legislative power of the state. There is no more reason for discontinuing a ferry, which is but the continuation of a highway, than there is for discontinuing a street or alley, the fee of which is vested in the city of New York, and held by it in trust for the public use, and if the public officials, charged with the duty of maintaining these ferries, attempt to discontinue them, it constitutes an illegal official act, and it is within the power of this court, at the suit of a taxpayer, to restrain them from discontinuing such ferries, even though such restraining order compels them to take some affirmative action. To enjoin a public official from violating his duty is one of the purposes of the act of 1892 above quoted. Mandamus does not appear to be the proper remedy, for the reason that under the statute the city of New York may lease or operate the ferry, and it is not the province of a writ of mandamus to determine how a duty, resting in discretion, is to be performed. Proceeding in equity, at the suit of a taxpayer, the court may properly enjoin the public officials from illegal official acts, or it may "prevent waste or injury to," or it may compel the restoration or the making good, "any property, funds or estate" of the city.

The order appealed from should be reversed, and the injunction should be continued during the pendency of the action.

---

## McLAIN v. BIRD et al.

(Supreme Court, Special Term, New York County. January 28, 1910.)

1. ADVERSE POSSESSION (§ 88*)—PAYMENT OF TAXES—EFFECT AS ACT OF OWNERSHIP.

  Payment of taxes by a tax lessee in possession is not conclusive evidence of a claim of title, but it may be considered with other evidence bearing on the claim of title.

  [Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 509; Dec. Dig. § 88.*]

2. ADVERSE POSSESSION (§ 12*)—NECESSITY OF CLAIM OF TITLE.

  To base a title on adverse possession, the possession must be under a claim of title in fee.

  [Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 65, 66, 387–393; Dec. Dig. § 12.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes